**Mike CARLOW and Carlow Enterprises, Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 95–751C.

United States Court of Federal Claims.

April 9, 1998.

Terry L. Pechota, Rapid City, SD, attorney of record for plaintiff.

Todd M. Hughes, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were Joseph A. Kijewski, Assistant Director, David M. Cohen, Director, and Frank W. Hunger, Assistant Attorney General, attorneys of record for defendant. Jean W. Sut-

ton, Office of Field Solicitor, United States Department of Interior, Ft. Snelling, MN, of counsel.

## OPINION

HORN, Judge.

## BACKGROUND

This case comes before the court on the defendant's motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) for lack of subject matter jurisdiction or, in the alternative, pursuant to RCFC 12(b)(4) for failure to state a claim upon which relief may be granted. The plaintiffs, Mike Carlow and Carlow Enterprises ("Carlow") filed a complaint[1] against the United States in this court which alleges that the defendant, the United States, acting through the United States Department of the Interior, Bureau of Indian Affairs ("BIA"), and following retrocession of a contract between BIA and the Oglala Sioux Tribe of Pine Ridge Indian Reservation ("the Tribe") failed to provide plaintiffs complete payment for the rental of heavy construction equipment used in a road construction project. The plaintiffs allege that $32,532.33 remains outstanding and is owed by the United States to the plaintiffs. Mike Carlow is the owner of Carlow Enterprises, a sole proprietorship, and he resides on the Pine Ridge Indian Reservation in South Dakota.

Defendant asserts that the plaintiffs are not parties to a contract with the federal government. According to the defendant, plaintiffs entered into a contract with the Tribe which post-dated the government's contract with the Tribe and that, therefore, as subcontractors to the Tribe, the plaintiffs are not in a contractual relationship with the United States. Defendant argues that as a subcontractor the plaintiffs lack privity of contract with the government and are without a basis under the Contract Disputes Act, 41 U.S.C. §§ 609(a)(1), 601(4) (1994), for subject matter jurisdiction in this court. Defendant contends that the Indian Self-Determi-

nation and Education Assistance Act ("the Indian Self–Determination Act"), 25 U.S.C. § 450(m)(1) (1994), merely establishes recovery rights in this court pursuant to the Contracts Dispute Act and only in the case of self-determination contracts between a tribal organization and the government. Consequently, defendant argues that because plaintiffs are not parties to the self-determination contract between the United States and the Tribe, the plaintiffs have no remedy pursuant to the Indian Self–Determination Act.

Plaintiffs respond that when retrocession of a tribal organization self-determination contract occurs, as in the instant case, the defendant agrees to place itself in the position of the prime contractor and becomes liable for the prime contractor's obligations. Plaintiffs allege that they were third-party beneficiaries of the contract between the tribal organization and the government, or that an express or an implied in fact contract was created between Carlow and the government.

Defendant rejects plaintiffs' theories and argues that retrocession of a self-determination contract does not operate to create an implied in fact contract or to put a subcontractor in privity of contract with the government, absent mutuality of intent, and does not act as a waiver of sovereign immunity. Defendant also denies the argument that the plaintiffs were intended third-party beneficiaries of the contract. In addition, defendant argues that plaintiffs are not even traditional subcontractors to the government in that plaintiffs were performing a contract entered into with an Indian tribe which had received funds from the government, and accordingly, defendant asserts, that the plaintiffs are "in an even more remote position than typical Government subcontractors." Consequently, the defendant maintains that the complaint should be dismissed for lack of jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted.

---

**1.** The plaintiff filed an initial complaint on November 14, 1995. The plaintiff filed an amended complaint on March 11, 1997 for the same claim which revised paragraph seven. All further references in this opinion are to the amended complaint.

## FACTS

On September 30, 1992, the BIA entered into a self-determination road construction contract on the Pine Ridge Indian Reservation in South Dakota, Contract No. CBA00370792 (the "self-determination contract"), with the Tribe. The contract was entered into by the Tribe and the United States pursuant to the Indian Self–Determination Act, which governs self-determination contracts between tribal organizations, and the United States and its agencies. 25 U.S.C. §§ 450 *et seq.* Under 25 U.S.C. § 450f(a)(1): "[t]he Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof, including construction programs." The total amount of the self-determination contract between the Tribe and the defendant was $1,947,843.87. According to 25 U.S.C. §§ 450b and 450f(a), a road construction contract, as in the instant case, qualifies as a self-determination contract. The Tribe then contracted with Mike Carlow and Carlow Enterprises for labor services and to rent heavy construction equipment to perform the road construction work which was the subject of the self-determination contract.

As early as May 3, 1993, the Tribe began to experience difficulty fulfilling the terms of its commitments. According to the December 1, 1994 "Findings and Determinations Sharps–Rockyford Grading Project Pine Ridge Indian Reservation" issued by the contracting officer in response to plaintiffs' claim for compensation, the Tribe Finance Committee met with the BIA, on May 3, 1993, to discuss the funding of the road construction project, and the concern that the Tribe:

> may not be able to complete the project in accordance with the terms of the contract without the Tribe incurring expenses beyond the contract price. It was recommended by the BIA staff that Mike Carlow, Project Manager generate a work schedule to get the project moving and the OST [Oglala Sioux Tribe] Treasurer, Melvin Cummings would review the project

finances and report is [sic] findings to the OST Finance Committee.

Even after attempting to revise its construction schedule and to take other actions in accordance with the suggestions made by the BIA, on July 13, 1993, the Tribe still found itself unable to complete the project within the terms of the contract.

On August 11, 1993, the Oglala Sioux Tribal Executive Council passed Resolution No. 93–76XB stating "that the Oglala Sioux Tribe does hereby request retrocession of the ... [self-determination] contract of the Rockyford/Sharps Road construction project to the BIA." This resolution dictated that "all work and other construction activity related to such road project cease as of 4:30 p.m., August 13, 1993. The Oglala Sioux Tribe shall not be liable, not responsible for any wages, and/or any other financial obligation for such project incurred after 4:30 p.m., August 13, 1993." On August 12, 1993, the day after the Executive Council of the Tribe requested retrocession of the self-determination contract in Resolution 93–67XB, the BIA Area Director received a letter from the Superintendent of the Pine Ridge Agency with a copy of retrocession Resolution 93–76XB. This letter states that "[t]he Oglala Sioux Tribe is requesting assistance with the close out of this P.L. 93–638 Road Construction Project. Specifically, they would like ... assist[ance] with the reconciliation of their project costs on the Sharps–North project." On September 2, 1993, the Oglala Sioux Tribal Council passed Resolution 93–139 reiterating the August 13, 1993 retrocession request for "the OST [Oglala Sioux Tribe]-BIA Contract for Road Construction of the Rockyford to Sharp's Comer Road." The effective date of this second Tribal Council resolution was backdated so that it likewise indicated that all work on the project and liability was to cease as of August 13, 1993.

The Tribe, in both resolutions, stated "that such retrocession procedure fully comply [sic] with 25 CFR, Ch. 1, Subpart F, ss [sic] 271.71 and 271.72." The sections of the BIA regulations, which deal with retrocession and reassumption provide in relevant part:

## § 271.71 Retrocession.

(a) Tribal governing bodies not only have a right to contract for Bureau programs or portions thereof, as they choose, but also have a right to return responsibility for the operation of a contracted program or portion thereof to the Bureau for any reason they deem appropriate. Retrocession specifically recognizes the Federal Government's unique and continuing relationship with and responsibility to Indian people.

(b) When a tribal organization experiences specific problems with the operation of a contract and is considering the possibility of retrocession, it may request the Bureau to assist it to avoid retrocession. In the event of such a request, the Bureau will:

(1) Meet with appropriate officials of the tribal organization and the tribe, where the tribal governing body is not the contractor, to develop a plan to avoid retrocession.

(2) Provide, to the extent possible, special technical assistance to assist the tribal organization to satisfactorily operate the program and enable it to avoid retrocession.

## § 271.72 Full retrocession procedures.

(a) Whenever an Indian tribe requests retrocession of a contract, retrocession shall be effective upon a date specified by the Commissioner or Area Director as appropriate but no later than 120 days after the date of the request from the tribe(s), except when the tribe(s) and the Commissioner mutually agree on a later date.

\*　　\*　　\*　　\*　　\*　　\*

(d) Within 15 days after receipt by the Commissioner or Area Director of a request for retrocession, representatives of the tribe(s), the tribal organization when appropriate, and the Commissioner or Area Director as appropriate shall meet and take the following actions:

(1) Mutually agree on a plan for orderly transfer of responsibilities.

(2) Mutually agree on a plan for inventorying and accounting for materials and supplies on hand, equipment, facilities and real property.

(3) Establish an accounting of funds, current and anticipated obligations, and costs of operation until the retrocession date.

(4) Identify all records relating to the contract and to the contracted function.

(e) On the date of retrocession, the tribal contractor will deliver to the Bureau all property that was acquired with contract funds and all materials, supplies and records of whatever nature which have been identified as necessary for the continuation of the program, project or function.

(f) Within 60 days after retrocession, the tribe(s) and the Bureau will jointly develop a report to the Commissioner outlining the reasons why retrocession was requested.

25 C.F.R. §§ 271.71, 271.72 (1992). Part (a) of section 271.76 is also relevant:

## § 271.76 Bureau operation of retroceded, reassumed or canceled for cause contracts.

(a) The Bureau shall provide to the tribe(s) and Indians served by a contract which is retroceded, reassumed or canceled for cause not less than the same quantity and quality of service that would have been provided at the level intended by the contract or operated previously by the Bureau.

25 C.F.R. § 271.76 (1992).

On September 24, 1993, after the Tribe requested retrocession of the self-determination contract, the contracting officer signed Modification No. 1 in order to transfer monies on the contract following the retrocession. In the description of the amendment/modification section, the modification states:

This modification change [sic] the total amount of the contract from $1,791,100.85 to $100.85 for a decrease of $1,791,000.00. The Oglala Sioux Tribe (Prime Contractor) has retroceded this contract (Resolution No. 93–139). It is necessary to decrease the contract to cover the contract award of the takeover contractor.

This is an existing urgency due to the fact that the project was left in an unsuitable condition for public use. This justifies the award to another contractor before official-

ly closing out this contract. Close out of this contract will follow upon completion of final calculations.

Originally, no documents were submitted to this court reflecting a "plan for orderly transfer of responsibilities" following retrocession, as required by 25 C.F.R. § 271.72(d)(1). Subsequently, however, at the court's request, the parties submitted various papers documenting the aftermath of the retrocession.

On January 26, 1994, the plaintiffs submitted a claim in the amount of $32,532.33 to the contracting officer. Plaintiffs claim the defendant owed this amount to them as an "Equipment Supplier to the Oglala Sioux Tribe" for "rental of machinery to the Oglala Sioux Tribe to move dirt on the above named project." The claim for $32,532.33 is based upon two August 16, 1993 invoices representing the equipment supplied to the project, from July 10, 1993 through August 13, 1993, as having a rental value of $52,532.33. The Tribe had paid $ 20,000.00 of this amount on September 1, 1993. The plaintiffs claim that $32,532.33 is still due from the defendant.

On December 1, 1994 the contracting officer issued "Findings and Determinations Sharps–Rockyford Grading Project Pine Ridge Indian Reservation," written in response to Carlow Enterprises' January 26, 1994 claim. The contracting officer determined:

> The Oglala Sioux Tribe did received [sic] payment in accordance within the terms of the contract. Funds disbursed, although utilized for project costs, overran the Tribe's project expenses due to a lack of expertise and experience in the road construction field.

> The Bureau of Indian Affairs hereby agrees to assist the Oglala Sioux Tribe in meeting the Tribe's obligation under Contract No. CBA00370792. However, Mike Carlow, owner of Carlow had also been considered to be a contracted employee. Contracted employee [sic] are employees of the Federal Government hired under the contract. The Federal Government Executive order 12731 consideres [sic] creating the appearance of using a public office (employment) for private gain, a con-

flict of interest. To eliminate this conflict, Carlow Enterprises can only receive [sic] compensation in one area, equipment rental or personal services, not both. Carlow Enterprises has been compensated under the contract for equipment rental in the amount of $137,153.84 and has also been compensated under the contract for personal services in the amount of $47,010.00. Ther[e]fore, using the lesser amount [of] Mr. Carlow's wages the amount of $47,010.00 is being disallowed. Based on these calculations, Mr. Carlow was over compensated for his involvement as an employee and for equipment rental provided to the OST under Contract No. CBA00370792 in the amount of $14,447.67, determining that no further compensation is due to Mike Carlow, Sr. or his company Carlow Enterprises.

In its answer to plaintiffs' complaint, the defendant cites to invoices submitted by Foothills Contracting, and a January 13, 1994 claim by Foothills Contracting against the government in the amount of $157,929.88. Foothills Contracting, like Carlow Enterprises, was an equipment supplier of rental dirt-moving machinery to the Tribe. Mike Knight, of Foothills Contracting, who was co-superintendent of the road construction project with Mike Carlow, also provided both equipment and labor services to the project. In the "Findings and Determinations" decision issued by the contracting officer regarding the claim submitted by Foothills Contracting, the government awarded compensation to Foothills Contracting in the amount of $148,929.88 as "legitimate project costs," but rejected the remaining claim for $9,397.50 as "personal services," in an action similar to the one taken by the contracting officer respecting Carlow's claim. Unlike the contracting officer's "Findings and Determinations" regarding Carlow, the President of the Tribe concurred with and signed the "Findings and Determinations" for Foothills Contracting's claim.

The record also contains a number of relevant documents submitted by the defendant. One letter, signed by the President of the Tribe and sent to the BIA contracting officer on February 15, 1994, authorizes the BIA to

make payment on claims relating to Contract No. CBA00370792, Sharps/Rockyford Road Project. The President of the Tribe also sent a letter two days later to the contracting officer "requesting your assistance to make payments on claims relating to this contract," following recent developments and changes in administration of the contract. Then, on March 16, 1994, the Treasurer of the Tribe sent a letter to the contracting officer indicating that retrocession had occurred on the contract, and listing the amount of funds for services and supplies that "were not paid in full prior to the above referenced retrocession." Carlow Enterprise is noted on that list as being owed $32,532.33. The letter further states:

> The Oglala Sioux Tribe is requesting that the BIA immediately pay to the above listed suppliers the respective amounts listed above. It is our understanding that the amount owed to the suppliers shall be paid with funds from the Rockyford to Sharps Road allocation.

When the debt alleged in the letter to be outstanding to plaintiffs was not paid, the plaintiffs first filed a claim with the contracting officer on January 26, 1994. After denial of their claim by the contracting officer, the plaintiffs filed the above-captioned action in this court. Plaintiffs have alleged that all nine contractors on this list, except for plaintiffs Carlow and/or Carlow Enterprises, were fully compensated by the government. However, the court notes that Foothills Contracting, which was also on this list, was not fully compensated in the amount of its claim and was treated in a fashion similar to plaintiffs, as indicated in the "Findings and Determinations" issued by the contracting officer in the answer to the claim submitted by Foothills Contracting.

## DISCUSSION

When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction, pursuant to RCFC 12(b)(1), and/or a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4), has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 746; *Alaska v. United States*, 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Alaska v. United States*, 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

In order for this court to have jurisdiction over plaintiffs complaint, the Tucker Act, 28 U.S.C. § 1491 (1994), as amended 28 U.S.C.A. § 1491 (Supp.1998), requires that a substantive right, which is enforceable

against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607, *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980) (*Mitchell I*); *United States v. Testan*, 424 U.S. 392, 398–99, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (*en banc*), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

■ Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan*, 424 U.S. at 398, 96 S.Ct. at 953. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States*, 17 Cl.Ct. 475, 479 (1989), *aff'd*, 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2967–68, 77 L.Ed.2d 580 (1983) (*Mitchell II*) (citing *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. at 954 (quoting *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States*, 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied*, 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

According to RCFC 12(b)(4), "[a] motion to dismiss for failure to state a claim upon which relief can be granted is appropriate where the plaintiff cannot assert a set of facts which would support its claim." *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 215 (Fed.Cir.1993), *cert. denied*, 511 U.S. 1106, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994) (citing *Chang v. United States*, 859 F.2d 893, 894 (Fed.Cir.1988)). In determining a motion to dismiss under RCFC 12(b)(4), the court "must 'assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant.'" *Mitchell Arms, Inc. v. United States*, 7 F.3d at 215 (citing *Gould v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991)). RCFC 12(b)(4) "mirrors" Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 12(b)(6); *Maniere v. United States*, 31 Fed. Cl. 410, 419 (1994). The court is required to deny a motion pursuant to RCFC 12(b)(4) or Rule 12(b)(6), "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. at 45–46, 78 S.Ct. at 102 (footnote omitted); *see also Maniere v. United States*, 31 Fed.Cl. at 419 (citing *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed.Cir.1993)).

At issue in the instant case is whether the defendant is liable to the plaintiffs on their claim for the rental of heavy construction equipment submitted to the contracting officer. It is clear in the above-captioned case that neither Mike Carlow nor Carlow Enterprises signed a contract with the United States. Mike Carlow and/or Carlow Enterprises, however, did agree to provide services to the Tribe. The plaintiffs, however, claim that they were intended third-party beneficiaries under the self-determination contract between the Tribe and the defendant, as further emphasized by the retrocession of that contract, and that the government stands in the place of the Tribe with respect

to the monies owed to the plaintiffs. In the alternative, the plaintiffs claim they should be able to recover on their claim as the result of an express or implied in fact contract with the United States.

This court's jurisdiction is governed by the Tucker Act, which states in relevant part: "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States...." 28 U.S.C.A. § 1491(a)(1). Furthermore, the Contract Disputes Act states that a contractor may bring an action directly on the claim in the United States Court of Federal Claims based on an express or implied contract entered into by an executive agency for the procurement of services, and the procurement of construction, alteration, repair or maintenance of real property. 41 U.S.C.A. §§ 602, 609 (Supp.1998).

Ordinarily, a subcontractor is an incidental beneficiary of a contract between the prime contractor and the owner. *Restatement (Second) of Contracts* § 302, cmt. E, illus. 19. If plaintiffs are considered as traditional subcontractors of the government, they cannot establish privity of contract with the government. The United States Court of Claims addressed the rights of a subcontractor, by writing:

> It is clear that, unless the plaintiff can provide evidence of the existence of some type of contract between it and the United States, it cannot, as a subcontractor, recover directly from the United States for amounts owed to it by the prime. *United States v. Munsey Trust Co.*, 332 U.S. 234, 241, 67 S.Ct. 1599, 1602–03, 91 L.Ed. 2022 (1947); *United States Fid. & Guar. Co. v. United States*, 201 Ct.Cl. 1, 5, 475 F.2d 1377 (1973).

*Putnam Mills Corp. v. United States*, 202 Ct.Cl. 1, 8, 479 F.2d 1334 (1973). Subsequently, the United States Court of Appeals for the Federal Circuit endorsed the above-quoted words and added: "[t]hus, the no-privity rule is synonymous with a finding that there is no express or implied contract between the government and a subcontractor." *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550 (Fed.Cir.1983).

Therefore, to have a viable claim in this court, plaintiffs must be able to establish a contractual relationship with the defendant as a third-party beneficiary or as the result of an implied in fact contract. Plaintiffs cite to *Erikson v. United States*, 12 Cl.Ct. 754 (1987), in support of their argument that jurisdiction is proper in this court based on their status as intended third-party beneficiaries, and particularly to the following language:

> It is well established that this court may assert jurisdiction over claims brought by plaintiffs who are not named parties to, but rather are intended third-party beneficiaries of government contracts. *Hebah v. United States*, 192 Ct.Cl. 785, 428 F.2d 1334 (1970); *Busby School of the Northern Cheyenne v. United States*, 8 Cl.Ct. 596 (1985).

*Erikson v. United States*, 12 Cl.Ct. at 757.

Section 302 of the *Restatement (Second) of Contracts* defines third-party beneficiaries as:

### § 302. Intended and Incidental Beneficiaries

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Restatement (Second) of Contracts* § 302 (1981); *see also Montana v. United States*, 124 F.3d 1269, 1273–74 (Fed.Cir.1997) (quoting *Restatement (Second) of Contracts* § 302); *Norwest Bank Arizona v. United States*, 37 Fed.Cl. 605, 608 (1997) (quoting *Restatement (Second) of Contracts* § 302).

In order to show a contractual relationship with the defendant as a third-party beneficiary of a contract, the plaintiffs must demonstrate that the "parties expressly or impliedly intended that the contract in question specifically benefit the party claiming third-party beneficiary status." *Schuerman v. United States,* 30 Fed.Cl. 420, 428 (1994).[2] The Court of Appeals for the Federal Circuit, in *Montana v. United States,* 124 F.3d 1269 (Fed.Cir.1997), agreed with the third-party beneficiary test enunciated in *Schuerman,* as requiring the contract to reflect the express or implied intention of the parties to benefit the third party. *Id.* at 1273. The court in *Montana* also indicated that:

> The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby. One way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him.

*Id.* (footnote omitted). The test articulated in this circuit is premised upon the decision of the United States Supreme Court that held "[b]efore a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least, show that it was intended for his direct benefit." *German Alliance Insurance Co. v. Home Water Supply Co.,* 226 U.S. 220, 230, 33 S.Ct. 32, 35, 57 L.Ed. 195 (1912). *See also D & H Distrib. Co. v. United States,* 102 F.3d 542 (Fed.Cir. 1996).

In order for the plaintiffs to have a viable claim in this court the plaintiffs must demonstrate that they were intended third-party beneficiaries of the self-determination contract between the Tribe and the United States as evidenced by the intent or words of the self-determination contract, the retrocession of that contract, or the modification to that contract. In the instant case, the court must start with consideration of the unique relationship between the Tribe and the United States and whether self-determination contracts, with the automatic right of the Tribe to demand retrocession, may occasion individuals and/or entities such as the plaintiffs to become intended third-party beneficiaries of the self-determination and, therefore, make them eligible to recover on legitimate debts from the United States upon retrocession.

The underlying statutory scheme of the Indian Self–Determination Act, pursuant to which the BIA regulations were issued, provides support for plaintiffs' contention that upon retrocession of the contract, the parties intended to substitute the defendant in the place of the Tribe on the road construction project and that the defendant assumes the Tribe's obligations and responsibilities on the project. The Indian Self–Determination Act recognizes that the government has a "historical and special legal relationship with, and resulting responsibilities to, American Indian people." 25 U.S.C. § 450(a). The statute also recognizes a responsibility on the part of the federal government to individual Indian tribes:

> through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services. In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.

25 U.S.C. § 450a(b). One vehicle to be utilized in accomplishing these statutory goals

---

2. The court in *Schuerman* rejected a two-prong test articulated in *Baudier Marine Electronics, Sales and Service, Inc. v. United States,* 6 Cl.Ct. 246, 249 (1984), *aff'd mem.,* 765 F.2d 163 (Fed. Cir.1985), the second prong of which additionally required that "the contract must reflect the intent not merely to benefit the third-party but also to give him the direct right to compensation or to enforce that right against the promisor." *Baudier Marine Electronics, Sales and Service, Inc. v. United States,* 6 Cl.Ct. at 249 (citations omitted). *See also Norwest Bank Arizona v. United States,* 37 Fed.Cl. at 608.

782

is the "self-determination contract" which is defined in the statute at section 450b(j) as:

"self-determination contract" means a contract (or grant or cooperative agreement utilized under section 450e–1 of this title) entered into under part A of this subchapter between a tribal organization and the appropriate Secretary for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law: *Provided,* That except as provided the last proviso in section 450j(a) of this title, no contract (or grant or cooperative agreement utilized under section 450e–1 of this title) entered into under part A of this subchapter shall be construed to be a procurement contract;

25 U.S.C. § 450b(j). The framework for self-determination contracts is detailed in 25 U.S.C. § 450f. Moreover, the Indian Self–Determination Act also exercises control over any contracts the Tribe enters into pursuant to a self-determination contract and details federal requirements to which such contracts and subcontracts must conform, such as regarding prevailing wage rates determined by the United States Secretary of Labor in accord with the Davis–Bacon Act and Indian preference requirements.

Furthermore, the legislative history of the Indian Self–Determination Act, 25 U.S.C. § 450, *et seq.,* under the heading "Claims Resulting from Performance of Contract, Grant Agreement, or Cooperative Agreement; Civil Action Against Tribe, Tribal Organization, Etc., Deemed Action Against United States; Reimbursement of Treasury for Payment of Claims," states:

With respect to claims resulting from the performance of functions during fiscal year 1991 and thereafter, or claims asserted after September 30, 1990, but resulting from the performance of functions prior to fiscal year 1991, under a contract, grant agreement, or any other agreement or compact authorized by the Indian Self–Determination and Education Assistance Act of 1975, as amended ... an Indian tribe, tribal organization or Indian contractor is deemed hereafter to be part of the Bureau of Indian Affairs in the Department of the Interior ... while carrying out any such contract or agreement and its employees are deemed employees of the Bureau ... while acting within the scope of their employment in carrying out the contract or agreement: *Provided,* That after September 30, 1990, any civil action or proceeding involving such claims brought hereafter against any tribe, tribal organization, Indian contractor or tribal employee covered by this provision shall be deemed to be an action against the United States and will be defended by the Attorney General and be afforded the full protection and coverage of the Federal Tort Claims Act....

Pub.L. 101–512, Title III, § 314, Nov. 5, 1990, 104 Stat.1959, as amended Pub.L. 103–138. Title III, § 308, Nov. 11, 1993, 107 Stat. 1416, codified at 25 U.S.C.A. § 450f Hist. & Stat. Notes (1997 Supp.). This legislative history suggests that if the Tribe is deemed to be part of the BIA while carrying out the self-determination contract, the contract entered into by the Tribe with plaintiffs should be protected by a guarantee from the United States. While not directly addressing the retrocession process, this language also supports the theory that pursuant to an Indian self-determination contract the government intends to assume, in the event of retrocession, the legitimate debts of the Tribe on contracts such as the one at issue in the above-captioned case.

Another indicia that plaintiffs were intended third-party beneficiaries of the self-determination contract between the United States and the Tribe is the unilateral retrocession process by which the Tribe has an automatic right to have retrocession occur upon its request. The Oglala Sioux Tribal Council issued Resolution 93–139 on September 2, 1993 which requested retrocession of Contract No. CBA00370792. Retrocession is governed by the Department of Interior, Bureau of Indian Affairs' regulations contained in 25 C.F.R. Chapter 1, § 271, Subpart F—Retrocession and Reassumption (1992). These BIA regulations direct that the Tribe has a right to return to the BIA responsibility for the operation or close out of a contracted program in whole

or in part, for any reason the Tribe deems appropriate. This creates a duty on the part of the BIA to assume responsibility for the operation or close out of a contracted construction program which was initiated pursuant to a self-determination contract. In fact, the regulation sets a time for when retrocession becomes automatically effective, once a retrocession request is made by the Tribe, thereby making it clear that the defendant has no right to refuse a retrocession request. 25 C.F.R. § 271.72(a). In the words of section 271.71(a) of the BIA regulations:

> Tribal governing bodies not only have a right to contract for Bureau programs or portions thereof, as they choose, but also have a right to return responsibility for the operation of a contracted program or portion thereof to the Bureau for any reason they deem appropriate. Retrocession specifically recognizes the Federal Government's unique and continuing relationship with and responsibility to Indian people.

*Id.*

Furthermore, Modification No. 1 to the contract between the Tribe and the defendant, signed by the contracting officer on September 24, 1993, states that "[c]lose out of this contract [between the Tribe and the BIA] will follow upon completion of final calculations." The contracting officer's statement in this contract modification that "close out" of the contract will follow upon completion of final calculations, appears to reflect the defendant's intent to calculate, review and address the obligations of parties claiming payments owed for services, supplies and equipment under the contract. The contracting officer's phrase "close out," was adopted in a letter sent August 12, 1993, by the BIA Superintendent of the Pine Ridge Agency to the Area Director, relating the Tribe's request to help with the "close out" of the road construction project and the "reconciliation ... of their project costs on the Sharps–North Project." The logical conclusion is that the BIA intended to settle or resolve the obligations to contractors such as Carlow.

The Tribe likewise expected the BIA to undertake the Tribe's obligations to those with whom or with which it had contracted on the road construction project. The correspondence in the record from the tribal leadership to the contracting officer after the retrocession indicates that the Tribe expected the BIA to cover its contractual obligations on the road project. For example, in a letter dated March 16, 1994, after the Tribe had retroceded the contract back to the BIA, the Tribe sent a list of nine equipment and services suppliers, including the plaintiffs, to the BIA "requesting that the BIA immediately pay [the] suppliers the respective amounts listed above." Once again, the logical conclusion is that the Tribe intended that the BIA would resolve its obligations to its contractors, including the plaintiffs, under the retroceded contract.

Although there is no mention of the plaintiffs or any other contractor on the road construction project in the self-determination contract between the Tribe and the United States, in the two resolutions passed by the Oglala Sioux Tribe, Resolution 93–76XB and 93–139, or in the contract modification to the self-determination contracts, this court finds that the plaintiffs and those similarly situated were intended beneficiaries of the self-determination contract between the Tribe and the defendant. *See Montana v. United States,* 124 F.3d at 1273 (stating that intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby). The court also finds that the self-determination contract entered into between the United States and the Tribe, after retrocession and as modified, places the plaintiffs within the accepted parameters of intended third-party beneficiary law. It is apparent to the court that all parties to the self-determination contract intended for the United States to satisfy the legitimate debts and obligations of the Tribe to contractors who performed compensable work on the road construction project.

The court's determination that plaintiffs have jurisdiction to present a claim to this court, however, does not end the matter. Even when the complaint and documents contained in the record before the court are construed most favorably to the plaintiffs, there remains for resolution the concerns

raised in the contracting officer's "Findings and Determinations," written in response to plaintiffs' January 26, 1994 claim, as to the validity of plaintiffs' particular monetary claim. While acknowledging the BIA's responsibilities on the road construction project, the contracting officer determined that:

> The Oglala Sioux Tribe did received [sic] payment in accordance within the terms of the contract. Funds disbursed, although utilized for project costs, overran the Tribe's project expenses due to a lack of expertise and experience in the road construction field.

> The Bureau of Indian Affairs hereby agrees to assist the Oglala Sioux Tribe in meeting the Tribe's obligation under Contract No. CBA00370792. However, Mike Carlow, owner of Carlow had also been considered to be a contracted employee. Contracted employee [sic] are employees of the Federal Government hired under the contract. The Federal Government Executive order 12731 consideres [sic] creating the appearance of using a public office (employment) for private gain, a conflict of interest. To eliminate this conflict, Carlow Enterprises can only recieve [sic] compensation in one area, equipment rental or personal services, not both. Carlow Enterprises has been compensated under the contract for equipment rental in the amount of $137,153.84 and has also been compensated under the contract for personal services in the amount of $47,010.00. Therefore, using the lesser amount Mr. Carlow's wages the amount of $47,010.00 is being disallowed. Based on these calculations, Mr. Carlow was over compensated for his involvement as an employee and for equipment rental provided to the OST [Oglala Sioux Tribe] under Contract No. CBA00370792 in the amount of $14,447.67, determining that no further compensation is due to Mike Carlow, Sr. or his company Carlow Enterprises.

Plaintiffs must be prepared to refute the findings and conclusion of the contracting officer as quoted immediately above. The court will schedule a status conference with the parties shortly after the issuance of this decision.

## CONCLUSION

The defendant's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted is **DENIED.**

**IT IS SO ORDERED.**