CHANCELLOR MANOR, A Limited Partnership, Gateway Investors, Ltd., A Limited Partnership, Oak Grove Towers Associates, A Limited Partnership, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 98–39 C.

United States Court of Federal Claims.

Nov. 30, 2001.

---

Jeff H. Eckland, Minneapolis, Minnesota, attorney of record for plaintiffs.

Mark L. Josephs, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant.

## OPINION

LYDON, Senior Judge.

The plaintiffs in this action are each the owner of a multifamily rental housing project whose construction was financed with a low-cost mortgage loan insured by the U.S. Department of Housing and Urban Development pursuant to section 236 of the National Housing Act, as amended. Plaintiffs assert

that they each entered into a contract with the United States, through the Department of Housing and Urban Development, which granted them the right to prepay their mortgages without government approval after 20 years, and thereby free themselves of regulations limiting their rental rates and income. Plaintiffs allege that these contracts were breached by the United States when federal legislation was enacted in 1990—the Low–Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA), 12 U.S.C. §§ 4101 *et seq.*—which anticipatorily repudiated the Government's contractual obligation to permit prepayment. Plaintiffs also allege that the legislation resulted in a taking of their properties without just compensation in violation of the Fifth Amendment to the U.S. Constitution. Defendant denies that plaintiffs had any contract with the Government relating to the prepayment of their mortgage notes, or that any property interests belonging to the plaintiffs have been subject to a taking.

The case is before the court on defendant's motion for summary judgment. Plaintiffs oppose defendant's motion and seek a trial on the issues of contract formation, taking, and damages. For the reasons discussed hereinafter, the court finds that there was no breach of contract and no taking by the Government. Defendant's motion for summary judgment is granted.

### *FACTUAL BACKGROUND*

National housing policy, the goal of which is to provide "a decent home and a suitable living environment for every American family," 42 U.S.C. § 1441, began in the New Deal era with the passage of the National Housing Act (NHA) of 1934 and the United States Housing Act of 1937. Initially the federal government sought to provide low-income housing primarily by subsidizing projects developed, owned, and managed by local public housing authorities. During the 1960s the federal government shifted its focus by enacting legislation to encourage the construction, ownership and management of low and moderate-income housing by private owners. Specifically, Congress amended the National Housing Act in 1961 by establishing the section 221(d)(3) program, 12 U.S.C. § 1715*l*(d)(3), allowing the Federal Housing Administration (which was subsumed in the newly-created Department of Housing and Urban Development, HUD, in 1965) to provide mortgage insurance and below-market interest rate loans to private owners. In 1968 Congress amended the NHA again, establishing the section 236 program, 12 U.S.C. § 1715z–1, which allows HUD to provide mortgage insurance and interest rate subsidies to private owners. Both the section 221(d)(3) and section 236 programs require owners to pass on the financial benefits of the government-insured loans to tenants in the form of lower rents.

Owners accepting a government-insured loan pursuant to the section 221(d)(3) and section 236 programs were subject to HUD regulations governing the use of their properties. They were restricted as to the distribution of their income, the rents and other fees they could charge, and their methods of operation. 24 C.F.R. §§ 221.510(c), 236.10(c) (1970). Owners were also limited to a six percent rate of return on their initial equity investment in the project. 24 C.F.R. §§ 221.531(b), 221.532(a), and 236.50(a), (b) (1970).

The plaintiffs in this action each own property in or near Minneapolis, Minnesota, on which rental housing complexes were constructed in 1973 and 1974. Chancellor Manor, a Limited Partnership (hereinafter "Chancellor Manor"), owns a 200–unit complex called *Chancellor Manor;* Oak Grove Towers Associates, a Limited Partnership (hereinafter "Oak Grove Towers"), owns a 228–unit complex called *Oak Grove Towers;* and Gateway Investors, Ltd., a Limited Partnership (hereinafter "Gateway Investors"), owns a 269–unit complex called *Rivergate Apartments.* Each of the plaintiffs entered into a transaction with HUD and a private lender in accordance with § 236 of the NHA, as amended, pursuant to which their properties were built and operated as low-income housing under the section 236 program. Each transaction encompassed multiple legal instruments, including (1) a Regulatory Agreement (FHA Form No. 3136), (2) a Mortgage (FHA Form 4133–B), (3) a Mort-

gage Note (HUD form 48322–P Rev. 6/63), (4) a Commitment for Insurance of Advances (FHA Form No. 2432), and (5) a Mortgagor's Certificate (FHA Form No. 2433) Thus, all of the legal instruments were on forms prepared and approved by HUD. The specifics of the respective transactions are as follows:

### Chancellor Manor

On October 28, 1971, the Federal Housing Commissioner, acting as agent for the Secretary of HUD, issued a Commitment for Insurance of Advances ("HUD Commitment") to Shelter Mortgage Corporation ("Shelter Mortgage"), a private lending institution, and Chancellor Manor. The HUD Commitment provided that the Commissioner would endorse for insurance "under the provisions of section 236 of the National Housing Act, and the Regulations thereunder now in effect," a mortgage upon Chancellor Manor in the amount of $3,634,000, "subject to compliance with the requirements of the Regulations" and the terms and conditions set forth in the Commitment. The Commitment specified that the loan would bear an interest rate of seven percent per annum, and that the loan was to be paid off over a period of 40 years.

The HUD Commitment specified that "[a] project shall be constructed on the mortgaged property in accordance with the Drawings and Specifications filed with the Commissioner" and that "[u]pon completion of the project in accordance with the Drawings and Specifications the mortgage note will be finally endorsed for insurance to the extent of the advances of mortgage proceeds approved by the Commissioner, subject to reduction as provided in the Regulations." The Commitment required that "[a]t initial endorsement of the mortgage for insurance, there shall be filed with the Commissioner copies of all instruments or agreements necessary under the laws of the applicable jurisdiction to authorize the execution of the mortgage and the other closing documents, and a Regulatory Agreement or other instrument to permit the Commissioner's regulation of the Mortga-

gor as to rents, charges, and methods of operation."

On November 1, 1971, Chancellor Manor (as mortgagor) and Shelter Mortgage (as mortgagee) executed a Mortgage and Mortgage Note in the amount of $3,634,400. The Mortgage incorporated by reference both the "[Mortgage] Note and all of its terms" as well as "the Regulatory Agreement . . . . executed by the Mortgagor and the Federal Housing Commissioner, which is being recorded simultaneously herewith." The Mortgage Note was approved by HUD for insurance pursuant to section 236 of the National Housing Act. The Mortgage Note contained the following provision regarding prepayment:

> "The debt evidenced by this Note may not be prepaid either in whole or in part prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner except where: (1) The prepayment is in connection with the release of an individual unit for sale to a lower income, elderly or handicapped person, or (2) the maker is a limited dividend corporation which is not receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of 20 years from the date of final endorsement, or as a result of a sale of the project to a cooperative or nonprofit corporation or association and the purchase is financed with a mortgage insured pursuant to Section 236(j)(3) of the National Housing Act, as amended." [1]

Also on November 1, 1971, Chancellor Manor and HUD executed a Regulatory Agreement. In the Regulatory Agreement Chancellor Manor undertook, "[i]n consideration of the endorsement for insurance by [HUD] of the above described note . . . . and in order to comply with the requirements of Section 236 of the [NHA], as amended, and the Regulations adopted by [HUD] pursuant

---

1. Chancellor Manor, as well as its co-plaintiffs Oak Grove Towers and Gateway Investors, qualified as a limited dividend corporation which is not receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965.

thereto," to construct and maintain housing in accordance with HUD's specifications, to make payments due under the note in a timely manner, and to set aside cash reserves to self-insure against a default on the note. In addition, Chancellor Manor agreed to comply with specified limitations upon the income levels of tenants, rental rates, and the rate of return the owner could receive from the project. The Regulatory Agreement provided that it would "bind" Chancellor manor "so long as the contract of mortgage insurance continues in effect [and] during such further time as the Commissioner shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage."

On December 28, 1971, Chancellor Manor signed and forwarded to HUD a Mortgagor's Certificate stating that it "hereby agrees to accept a loan insured by [HUD] upon the terms set forth in your Commitment dated October 28, 1971, for the [Chancellor Manor] Project."

HUD finally endorsed Chancellor Manor's mortgage note for insurance under section 236 of the NHA on August 14, 1973. Thus, under the terms of the Mortgage Note, with its 20–year prepayment provision, and the federal regulations then in effect, Chancellor Manor could prepay its remaining debt to the lender "without HUD approval" after August 14, 1993.

### Oak Grove Towers

On March 13, 1972, the Federal Housing Commissioner (HUD) issued a Commitment for Insurance of Advances ("HUD Commitment") to the same Shelter Mortgage Corporation and Oak Grove Towers. Like the HUD Commitments to the other plaintiffs in this action, the Commitment to Shelter Mortgage and Oak Grove Towers provided that HUD would endorse for insurance "under the provisions of Section 236 of the National Housing Act, and the Regulations thereunder now in effect," a mortgage upon Oak Grove Towers in the amount of $3,872,800, "subject to compliance with the requirements of the Regulations" and the terms and conditions set forth in the Commitment. The Commitment specified that the loan would bear an interest rate of seven percent per annum, and that the loan was to be paid off over a period of 40 years.

Like the HUD Commitment to Chancellor Manor, the Commitment to Oak Grove Towers provided that "[a] project shall be constructed on the mortgaged property in accordance with the Drawings and Specifications filed with the Commissioner" and that "upon completion of the project in accordance with the Drawings and Specifications the mortgage note will be finally endorsed for insurance to the extent of the advances of mortgage proceeds approved by [HUD], subject to reduction as provided in the Regulations." In addition, the Commitment required that "[a]t initial endorsement of the mortgage for insurance there shall be filed with [HUD] copies of all instruments or agreements necessary under the laws of the applicable jurisdiction to authorize the execution of the mortgage and the other closing documents, and a Regulatory Agreement or other instrument to permit [HUD]'s regulation of the Mortgagor as to rents, charges and methods of operation."

On the same date the HUD Commitment was issued, Oak Grove Towers (as mortgagor) and Shelter Mortgage (as mortgagee) executed a Mortgage and Mortgage Note in the amount of $3,872,800. The Mortgage incorporated by reference both the "[Mortgage] Note and all of its terms" as well as "the Regulatory Agreement .... executed by the Mortgagor and the Federal Housing Commissioner, which is being recorded simultaneously herewith." The Mortgage Note was approved by HUD for insurance pursuant to section 236 of the National Housing Act. The Mortgage Note, like that of Chancellor Manor, contained the following provision regarding prepayment:

"The debt evidenced by this Note may not be prepaid either in whole or in part prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner except where: (1) The prepayment is in connection with the release of an individual unit for sale to a lower income, elderly or handicapped person, or (2) the maker is a limited dividend corporation which is not receiving pay-

ments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of 20 years from the date of final endorsement, or as a result of a sale of the project to a cooperative or nonprofit corporation or association and the purchase is financed with a mortgage insured pursuant to Section 236(j)(3) of the National Housing Act, as amended."

Also on March 13, 1972, Oak Grove Towers and HUD executed a Regulatory Agreement. In the Regulatory Agreement Oak Grove Towers undertook, "[i]n consideration of the endorsement for insurance by [HUD] of the above described note . . . . and in order to comply with the requirements of Section 236 of the [NHA], as amended and the Regulations adopted by HUD pursuant thereto," to construct and maintain housing in accordance with HUD's specifications, to make payments due under the note in a timely manner, and to set aside cash reserves to self-insure against a default on the note. In addition, Oak Grove Towers agreed to comply with specified limitations upon the income levels of tenants, rental rates, and the rate of return the owner could receive from the project. The Regulatory Agreement provided that it would "bind" Oak Grove Towers "so long as the contract of mortgage insurance continues in effect [and] during such further times as the Commissioner shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage."

Around the same time, or shortly thereafter, Oak Grove Towers signed and forwarded to HUD a Mortgagor's Certificate stating that it agreed to accept a HUD-insured loan for its housing project upon the terms set forth in the HUD Commitment dated March 13, 1972.

HUD finally endorsed the Oak Grove Towers mortgage note for insurance under section 236 of the NHA on January 31, 1974. Thus, under the terms of the Mortgage Note, with its 20–year prepayment provision, and the federal regulations then in effect, Oak Grove Towers could prepay its remaining debt to the lender "without HUD approval" after January 31, 1994.

### Gateway Investors

The initial purchase of property involved in this action took place in 1961, when the Knutson Company acquired a parcel of land from the Housing and Redevelopment Authority in and for the City of Minneapolis. The purchaser's parent company, Knutson Industries, Inc ., joined with several limited partners in 1973 to form Gateway Investors, Ltd., for the purpose of constructing and operating a 269–unit apartment building on the tract known as Rivergate Apartments.

On April 16, 1973, the Federal Housing Commissioner (HUD) issued a Commitment for Insurance of Advances ("HUD Commitment") to Knutson Mortgage and Financial Corporation ("Knutson Mortgage"), a private lending institution, and Gateway Investors. Like the HUD Commitments issued to Chancellor Manor and Oak Grove Towers, the Commitment to Knutson Mortgage and Gateway Investors provided that the Commissioner would endorse for insurance "under the provisions of Section 236 of the [NHA], and the Regulations thereunder now in effect," a mortgage upon Rivergate Apartments in the amount of $ 4,285,900, "subject to compliance with the requirements of the Regulations" and the terms and conditions set forth in the Commitment. The Commitment specified that the loan would bear an interest rate of seven percent per annum, and that the loan was to be paid off over a period of 40 years.

Like the other HUD Commitments herein, the Commitment to Gateway Investors provided that "[a] project shall be constructed on the mortgaged property in accordance with the Drawings and Specifications filed with the Commissioner" and that "upon completion of the project in accordance with the Drawings and Specifications the mortgage note will be finally endorsed for insurance to the extent of the advances of mortgage proceeds approved by [HUD], subject to reduction as provided in the Regulations." In addition, the Commitment required that "[a]t initial endorsement of the mortgage for insurance there shall be filed with [HUD] copies of all instruments or agreements necessary under the laws of the applicable jurisdiction to authorize the execution of the

mortgage and the other closing documents, and a Regulatory Agreement or other instrument to permit [HUD]'s regulation of the Mortgagor as to rents, charges and methods of operation."

On June 7, 1973, Gateway Investors (as mortgagor) and Knutson Mortgage (as mortgagee) executed a Mortgage and Mortgage Note in the amount of $4,285,900. The Mortgage incorporated by reference both the "[Mortgage] Note and all of its terms" as well as "the Regulatory Agreement .... executed by the Mortgagor and the Federal Housing Commissioner, which is being recorded simultaneously herewith." The Mortgage Note was approved by HUD for insurance pursuant to section 236 of the National Housing Act. The Mortgage Note, like those of the other plaintiffs herein, contained the following provision regarding prepayment:

"The debt evidenced by this Note may not be prepaid either in whole or in part prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner except where: (1) The prepayment is in connection with the release of an individual unit for sale to a lower income, elderly or handicapped person, or (2) the maker is a limited dividend corporation which is not receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of 20 years from the date of final endorsement, or as a result of a sale of the project to a cooperative or nonprofit corporation or association and the purchase is financed with a mortgage insured pursuant to Section 236(j)(3) of the National Housing Act, as amended."

Also on June 7, 1973, Gateway Investors and HUD executed a Regulatory Agreement. In the Regulatory Agreement Gateway Investors undertook, "[i]n consideration of the endorsement for insurance by [HUD] of the above described note .... and in order to comply with the requirements of Section 236 of the [NHA], as amended, and the Regulations adopted by HUD pursuant thereto," to construct and maintain housing in accordance with HUD's specifications, to make payments due under the note in a timely manner, and to set aside cash reserves to self-insure against a default on the note. In addition, Gateway Investors agreed to comply with specified limitations upon the income levels of tenants, rental rates, and the rate of return the owner could receive from the project. The Regulatory Agreement provided that it would "bind" Gateway Investors "so long as the contract of mortgage insurance continues in effect [and] during such further time as the Commissioner shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage."

On June 8, 1973, Chancellor Manor signed and forwarded to HUD a Mortgagor's Certificate stating that it "hereby agrees to accept a loan insured by [HUD] upon the terms set forth in your Commitment dated April 16, 1973, for the [Rivergate Apartments] Project."

HUD finally endorsed the Gateway Investors mortgage note for insurance under section 236 of the NHA on June 6, 1975. Thus, under the terms of the Mortgage Note, with its 20–year prepayment provision, and the federal regulations then in effect, Gateway Investors could prepay its remaining debt to the lender "without HUD approval" after June 6, 1995.

### Regulations

HUD regulations in effect during the 1970s with respect to the prepayment of mortgages insured under the section 236 program were consistent with the prepayment terms in the mortgage notes plaintiffs executed at that time. The regulations included the following language with respect to prepayment of a HUD-insured loan:

"*A mortgage indebtedness may be prepaid in full* and [HUD's] controls terminated without the prior consent of HUD where the mortgagor is a limited distribution type and either of the following conditions is met:

(i) If the prepayment occurs *after the expiration of 20 years from the date of the final insurance endorsement* of the mortgage ....

(ii) If the prepayment occurs as a result of the sale of the project to a cooperative or private nonprofit corporation or association...."

24 C.F.R. § 236.30(a)(1)(i) and (ii) (1973, 1974, 1975). (Emphasis added).

The regulations also provided that:

*"The regulations in this subpart may be amended by [HUD] at any time* and from time to time, in whole or in part, but such amendments shall not adversely affect the interests of a mortgagee or lender under the contract of insurance on any mortgage or loan already insured and shall not adversely affect the interests of a mortgagee or lender on any mortgage or loan to be insured on which [HUD] has made a commitment to insure."

24 C.F.R. § 236.249 (1973, 1974, 1975). (Emphasis added.)

*Legislation*

In the late 1980s Congress became concerned that owners of many housing projects with HUD-insured mortgage loans might soon choose to prepay their loans, potentially resulting in a shortage of low-income rental housing. On February 5, 1988, therefore, Congress enacted the Emergency Low Income Housing Preservation Act of 1987, P.L. 100–242, 101 Stat. 1877 (1988), 12 U.S.C. § 1715*l* note (the "1988 legislation" or "ELIHPA"). The 1988 legislation imposed two-year interim restrictions on the prepayment of HUD-insured low-income housing loans. ELIHPA provided that owners "may prepay, and a mortgagee may accept prepayment of, a mortgage on such housing only in accordance with a plan of action approved by [HUD]." ELIHPA, § 221(a), 101 Stat. 1878–79. Before approving a plan of action that would involve the termination of HUD-imposed affordability restrictions through prepayment, HUD was required to make written findings that the prepayment would have minimal effects on the current tenants and that there was an adequate supply of available comparable housing in the rental housing market served by the owner's project. *Id.* at § 225(a), 101 Stat. 1880. ELIHPA also authorized HUD to offer incentives to owners to maintain the affordability restric-

tions on their properties. *Id.* at § 225(b). Implementing regulations were issued by HUD in September 1990. 55 Fed.Reg. 38944 (Sept. 21, 1990), 24 CFR §§ 248,201 *et seq.* (1993).

On November 28, 1990, ELIHPA was superceded by the Low–Income Housing Preservation and Resident Homeownership Act of 1990, P.L. 101–625, 104 Stat. 4249 (1990), 12 U.S.C. § 4101 *et seq.* (the "1990 legislation" or "LIHPRHA"). The 1990 legislation, enacted as title VI of the Cranston–Gonzalez National Affordable Housing Act, extended indefinitely the bar upon prepayment of HUD-insured low-income housing loans without HUD approval. Like its predecessor statute, LIHPRHA provided that owners "may prepay, and a mortgagee may accept prepayment of, a mortgage on such housing only in accordance with a plan of action approved by [HUD]," 12 U.S.C. § 4101(a) (1994). To initiate a request for prepayment, and thereby end affordability restrictions on the property, an owner had to file a "Notice of Intent" with HUD. *Id.* at § 4102(a). (An owner had two additional options under LIHPRHA which could also be selected in the "Notice of Intent."—*i.e.,* to extend affordability restrictions on the property by requesting incentives or sell the property to a buyer who agreed to maintain the affordability restrictions.) After receiving a report from HUD, including two independent appraisals of the property, the owner had to file a Plan of Action indicating it was seeking to terminate affordability restrictions by prepaying the mortgage (or to extend the affordability restrictions by requesting incentives, or to sell the property to a buyer who agreed to maintain the affordability restrictions). *Id.* at § 4106, 4107. HUD was permitted to approve prepayment, terminating affordability restrictions, only after written findings that prepayment would have minimal impact on current tenants and not affect the adequate supply of affordable, low-income housing in the market served by the owner's project. *Id.* at § 4108(a). LIHPRHA tightened the evidentiary and procedural requirements for the written findings that HUD needed to make before it could approve a prepayment, *id.* at § 4108(b), and required HUD to disap-

prove prepayment if it could not make the necessary findings, *id.* at § 4108(c). At the same time, the 1990 legislation expanded HUD's authority to offer incentives to low-income housing owners to facilitate the continued operation of their projects for the benefit of low-income tenants. *Id.* at § 4109. Implementing regulations were issued by HUD in April 1992, 57 Fed.Reg. 11,492 (April 8, 1992), effective May 8, 1992.

With respect to the particular requirements for prepaying a HUD-insured mortgage, the statute precluded HUD from approving a prepayment request unless it found that:

"(1) *implementation* of the plan of action *will not*—

(A) *materially increase economic hardship for current tenants,* and will not in any event result in (i) a monthly rental payment by any current tenant that exceeds 30 percent of the monthly adjusted income of the tenant or an increase in the monthly rental payment in any year that exceeds 10 percent (whichever is lower), or (ii) in the case of a current tenant who already pays more than such percentage, an increase in the monthly rental payment in any year that exceeds the increase in the Consumer Price Index or 10 percent (whichever is lower); or

(B) *involuntarily displace current tenants* (except for good cause) where comparable and affordable housing is not readily available determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and

(2) *the supply of vacant comparable housing is sufficient* to ensure that such prepayment will not materially affect—

(A) the availability of decent, safe, and sanitary housing affordable to low-income and very low income families or persons in the area that the housing could reasonably be expected to serve;

(B) the ability of low-income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

(C) the housing opportunities of minorities in the community within which the housing is located."

12 U.S.C. § 4108 (1994) (emphasis added).

On March 28, 1996, the Housing Opportunity Program Extension Act of 1996 ("HOPE Act") was enacted which lifted the restrictions on prepayment of HUD-insured loans. P.L. 104–120, § 2, 110 Stat. 834, 12 U.S.C. § 4101 note (1996). The HOPE Act permitted the prepayment of low-income housing mortgages without HUD approval as long as the owner agreed not to increase rents in the project for 60 days after prepayment. Congress deemed the 60–day period "necessary in order to make available rental assistance for eligible families who desire to stay or move." H.R. Conf. Rep. No. 104–384, 104th Con., 1st Sess. at 47 (1995).

### Subsequent Developments

As previously discussed, the plaintiffs would have been able to prepay their remaining debt under the 20–year provisions of their mortgage notes (and the federal regulations in effect when the they were executed in the 1970s) after the following dates: Chancellor Manor—August 14, 1993; Oak Grove Towers—January 31, 1994; and Gateway Investors—June 6, 1995. On each of those dates, however, the prepayment restrictions of LIHPRHA were still in effect. Thus, notwithstanding the prepayment provisions of their mortgage notes, the plaintiffs' prepayment rights were in fact curtailed by federal law.

In late 1992 and early 1993, with the 20–year anniversary of HUD's final endorsement of its Mortgage Note approaching, Chancellor Manor contacted HUD and requested permission to prepay the note. According to the unrefuted affidavit (no. 1) of Antonio Bernardi, President of Chancellor Manor's general partner, Sentinel Holding Company, the owners of Chancellor Manor conducted several discussions with HUD officials, including the Branch Chief and Director of the Multifamily Housing Division, on the subject of prepayment. The owners were advised in early 1993 that Chancellor

Manor could not meet the criteria for prepayment under the new law (LIHPRHA), would not be permitted to prepay the Mortgage Note, and could only leave the section 236 program by selling the property to a non-profit organization approved by HUD. The other option presented to the owners, under LIHPRHA, was to accept financial incentives from HUD in exchange for maintaining section 236 affordability restrictions for the remaining useful life of the property. Chancellor Manor chose this latter option.

On January 14, 1993 *Chancellor Manor* filed with HUD its "Initial Notice of Intent to Terminate or Extend Low–Income Affordability Restrictions (Pursuant to Section 212 of [LIHPRHA])." The document, a HUD standard form, contained three options for the property owner which read as follows: (1) extend the low income affordability restrictions by requesting incentives or (2) offer to sell the housing to a qualified purchaser or (3) terminate the low income affordability restrictions through prepayment of the mortgage or voluntary termination of the mortgage insurance. Chancellor Manor elected the first option—*i.e.*, to "extend the low income affordability restrictions by requesting incentives." The requisite plan of action was submitted by Chancellor Manor on May 8, 1994, and approved by HUD on December 13, 1994. In its letter of approval HUD indicated that Chancellor Manor was eligible for an insured loan of $3,609,200 (composed of $2,489,384 for equity and $1,119,911 for anticipated rehabilitation costs) at an interest rate of 9.25 percent amortized for 32 years. Chancellor Manor was allowed a maximum annual return on the project of $28,106. HUD also advised that the plan would remain in effect throughout the remaining useful life of the project, which was estimated to be 50 years or until January 31, 2045.

To implement the approved plan of action HUD and Chancellor Manor executed a Use Agreement and Amendment of Existing Regulatory Agreement on February 14, 1995. This instrument confirmed that Chancellor Manor's new agreement with HUD was to continue in effect for the remaining useful life of the project. After 50 years Chancellor Manor may petition HUD for a determination that the useful life of the project has expired, and thereby end section 236 affordability restrictions. Even then, however, the burden of proof is on the owner and the remaining useful life of the project could extend beyond 50 years. Thus, Chancellor Manor is still in the NHA's section 236 program and, despite the subsequent enactment of the HOPE Act in 1996, precluded by its Use Agreement and Amended Regulatory Agreement with HUD from prepaying its HUD-insured loan and raising its rents to market levels.

Meanwhile, *Oak Grove Towers* and *Gateway Investors* were also approaching the 20–year anniversary of HUD's final endorsement of their Mortgage Notes. Like Chancellor Manor, they contacted HUD in late 1992 and early 1993 and requested permission to prepay their notes. According to the unrefuted affidavits (nos. 2 and 3) of Antonio Bernardi, President of Sentinel Holding Company, the general partner of Oak Grove Towers and Gateway Investors, the owners of Oak Grove Towers and Rivergate Apartments conducted several discussions with HUD officials, including the Branch Chief and Director of the Multifamily Housing Division, on the subject of prepayment. The owners were advised during 1993 that Oak Grove Towers and Gateway Investors could not meet the criteria for prepayment under the new law (LIHPRHA), would not be permitted to prepay their Mortgage Notes, and could only leave the section 236 program by selling their properties to non-profit organizations approved by HUD. The other option presented to the owners, under LIHPRHA, was to accept financial incentives from HUD in exchange for maintaining section 236 affordability restrictions for the remaining useful life of the properties.

On May 21, 1993 and May 9, 1994, respectively, Oak Grove Towers and Gateway Investors each filed an "Initial Notice of Intent to Terminate or Extend Low–Income Affordability Restrictions (Pursuant to Section 212 of [LIHPRHA])" with HUD. Like Chancellor Manor, they elected the first of the three options—*i.e.*, to "extend the low income affordability restrictions by requesting incen-

tives." Each owner submitted a requisite plan of action, which HUD approved on June 6, 1995 (for Oak Grove Towers) and September 29, 1995 (for Gateway Investors), respectively. In its letter(s) of approval HUD indicated that each plan of action, which would keep the subject housing project(s) in the NHA's section 236 program, would be implemented after the execution and recordation of a Use Agreement and Amended Regulatory Agreement. HUD advised that "[t]he term of the Use Agreement was to be for the remaining useful life of the project which has been determined by HUD to be a minimum of 50 years."

In March 1996, however, before any Use Agreement and Amended Regulatory Agreement had been executed for either housing project, the HOPE Act was enacted which reinstated the rights of low-income housing owners to prepay their HUD-insured mortgages without HUD approval. Oak Grove Towers and Gateway Investors each decided not to keep their projects in the section 236 program with additional incentives, electing instead to prepay their HUD-insured loans and terminate their affordability restrictions. After prepaying their Mortgage Notes in 1997, Oak Grove Towers and Gateway Investors each increased their rents to market levels on October 1, 1997.

On January 20, 1998, the plaintiffs filed a complaint in this court, alleging that the LIHPRHA legislation enacted in 1990(1) anticipatorily repudiated the contractual rights of the HUD project owners to terminate their mortgages after 20 years without prior HUD approval and (2) resulted in a taking of the subject properties for public use without just compensation by compelling the owners to extend the low-income use of their projects. On February 10, 1998, defendant filed an unopposed motion for a stay of proceedings pending resolution by the U.S. Court of Appeals for the Federal Circuit of *Cienega Gardens v. United States*, Nos. 97–5126 and 97–5134 (Fed.Cir.), on the grounds that "[w]hichever way the court of appeals resolves the contract liability question to be decided in that appeal, we anticipate that it will constitute a binding precedent upon this Court with respect to the substantially simi-

lar issue present in the [case at bar]." The court granted the motion to stay on February 11, 1998.

The Federal Circuit subsequently issued an opinion in *Cienega Gardens*, 194 F.3d 1231 (Fed.Cir.), on December 7, 1998, and denied a petition for rehearing on March 11, 1999 (*cert. denied by Sherman Park Apartments v. United States*, 528 U.S. 820, 120 S.Ct. 62, 145 L.Ed.2d 54 (Oct. 4, 1999)). The stay of proceedings was lifted by this court in June 1999 and discovery ensued. Defendant filed a belated answer to the complaint on February 1, 2000, denying any contractual or Fifth Amendment liability toward plaintiffs. Discovery closed on August 18, 2000. Defendant filed its motion for summary judgment on January 4, 2001. Plaintiffs filed their opposition thereto on April 30, 2001. Briefing was completed on October 24, 2001, and oral argument was held on October 30, 2001.

## DISCUSSION

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is "genuine" if, on the entire record, the evidence is such that a reasonable jury could resolve a factual matter in favor of the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. A fact is "material" if it could affect the outcome of the suit, and its materiality is determined by the substantive law applicable to the case. *Id.*

### I. *Breach of Contract Claims*

The Tucker Act grants the Court of Federal Claims jurisdiction over claims based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). To maintain a contract action under the Tucker Act, "the contract must be between the plaintiff and the government ...." *Ransom v. United States*, 900 F.2d 242, 244 (Fed.Cir.1990). In other words, there must be privity of contract between the plaintiff and the United States. "The government consents to be sued only by those with whom it has privity of contract." *Erick-*

son *Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984).

Defendant argues that the plaintiffs' contract claims must be dismissed based on the Federal Circuit's decision in *Cienega Gardens v. United States,* 194 F.3d 1231 (Fed. Cir.1998). That case, like the instant litigation, involved low-income housing owners who obtained HUD-insured mortgages from private lenders, pursuant section 221(d)(3) or section 236 of the National Housing Act, that included terms granting owners the right to prepay their mortgages after 20 years. The transactions in *Cienega Gardens* involved the same legal instruments among the owners, lenders, and HUD as those before the court in the case at bar. In considering those legal instruments in *Cienega Gardens,* the Federal Circuit stated: "The question before us is whether the transaction framed by the [HUD] commitment, the deed of trust note, the deed of trust, the loan agreement, and the regulatory agreement, each of which was in a form approved by HUD, gave rise to privity of contract between HUD and the Owner insofar as the right to prepay the mortgage loan was concerned. *We conclude that it did not.*" 194 F.3d at 1241 (emphasis added).

In reaching this conclusion, the Federal Circuit analyzed the transactions in *Cienega Gardens,* in pertinent part, as follows:

"It has never been argued that HUD failed to provide mortgage insurance, as required by each 'Commitment for Insurance of Advances.' In other words, it is undisputed that HUD discharged its obligations to the Owners under the various commitments..... Thus .... the question of whether privity of contract was satisfied turns, in the case of each Owner, on consideration of the deed of trust note and the regulatory agreement.....

We start from the premise that the United States, i.e., HUD, was a named party to only one contract in connection with each of the relevant projects, that contract being the regulatory agreement ..... The regulatory agreement did not incorporate any other agreement..... Neither did the regulatory agreement mention prepayment of the mortgage loan or incorporate any

agreement or provision addressing prepayment.....

The only document that addressed prepayment was the deed of trust note, with its attached Rider A. However, the agreement represented by each deed of trust note was between the relevant Owner and its private lending institution, as evidenced by the recitals at the beginning of the note..... Although HUD did provide its insurance endorsement, it was not expressly made a party to any deed of trust note or its attached Rider A.

Each deed of trust note was incorporated by reference into the applicable deed of trust. The deed of trust too represented a contract between the relevant Owner and its private lending institution .... Each deed of trust .... incorporated the regulatory agreement by reference. However, the incorporation of the regulatory agreement—which set forth obligations on the part of the Owner—into the rider to the deed of trust did not make HUD a party to the deed of trust.

While the deed of trust note (and the incorporated Rider A) and the regulatory agreement were part of the same transaction, each document stands alone and is unambiguous on its face. The documents evidence separate agreements between distinct parties..... The critical point is that the contract documents simply do not show privity of contract between the Owners and HUD with respect to a right to prepay the mortgage loans after twenty years without HUD approval."

*Id.* at 1241–43.

The transactions described in *Cienega Gardens* are identical to those involving Chancellor Manor, Oak Grove Towers, and Gateway Investors, and the reasoning applied by the Federal Circuit is directly applicable to the case at bar. Here, the regulatory agreements, to which HUD is a named party, do not mention prepayment or incorporate any other documents or agreements that do mention prepayment. The only instruments that address prepayment are the mortgage notes, to which HUD is not a named party. HUD's endorsement of the mortgage notes for insurance does not make

HUD a party to the notes. Similarly the incorporation of the regulatory agreements by reference into the mortgages does not make HUD a party to the mortgages. Both the mortgages and the mortgage notes, as evidenced by the recitals at the beginning of the documents, are contracts between the plaintiffs and the private lenders. Their decisions regarding what outside instruments or provisions to incorporate into the mortgages are not binding on HUD. In short, the documents involved in this action, as in *Cienega Gardens*, "evidence separate agreements between distinct parties." 194 F.3d at 1243. Most importantly, HUD is not a party to the mortgage notes. Thus, as the Federal Circuit found in *Cienega Gardens*, there is no privity of contract between HUD and the plaintiffs regarding the prepayment of the mortgages without HUD approval after 20 years. The opinions of the Federal Circuit are binding precedent on this court.

Plaintiffs argue that, notwithstanding the Federal Circuit's decision in *Cienega Gardens*, they are entitled to relief based on any of three distinct theories of contract liability that were not addressed in that opinion: (1) that a contract was formed between each plaintiff and the United States by virtue of HUD's offer, through the Commitments for Insurance of Advances, to provide the plaintiffs with government-insured loans that could be prepaid after 20 years, and each plaintiff's acceptance of the offer through the Mortgagor's Certificate, (2) that each plaintiff stood as a third-party beneficiary of the contracts executed between HUD and the plaintiffs' lenders, and (3) that the Government is judicially estopped from denying contract liability to the plaintiffs based on arguments that it previously asserted and prevailed upon in a federal district court action, *United States v. David*, Civil Action No. 94–7191, 1995 WL 57502, 1995 U.S.Dist. LEXIS 1630 (E.D.Pa.1995).

### 1.

▪ With respect to their first argument, plaintiffs assert that the Federal Circuit in *Cienega Gardens* never considered or ruled upon the contract formation theory asserted in this action—*i.e.*, that the execution of the Commitment for Insurance of Advances and the Mortgagor's Certificate created a contract between HUD and each of the plaintiffs for a HUD-insured loan with a 20–year prepayment option. Under the doctrine of *stare decisis*, plaintiffs argue, this court is not precluded by *Cienega Gardens* from considering this new contract theory. Plaintiffs quote a Supreme Court ruling that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925). The Federal Circuit has likewise declined to apply the rule of *stare decisis* in cases presenting issues not directly addressed and resolved in prior cases: "[W]hen an issue is not argued or considered in a decision, such decision is not precedent on that issue." *Houston Industries, Inc. v. United States*, 78 F.3d 564, 567 n. 3 (Fed.Cir.1996); "[W]e are unwilling to give *stare decisis* effect to a matter that we did not fully consider and that was not before us in the prior case." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1549 (Fed.Cir.1994).

Plaintiffs assert that HUD's Commitment for Insurance of Advances, which was sent to both the project owner and the private lender, constituted an offer to provide each of the plaintiffs with a government-insured loan. Plaintiffs cite language in the HUD Commitments advising that the government-insured mortgage note would be subject to section 236 of the National Housing Act "and the Regulations thereunder *now in effect.*" (Emphasis added.) In accord with those regulations the mortgage notes contained the following provision governing prepayment:

"The debt evidenced by this [Mortgage] Note may not be prepaid either in whole or in part prior to the final maturity date hereof without the prior written approval of [HUD] except where: (1) The prepayment is in connection with the release of an individual unit for sale to a lower income, elderly, or handicapped person; or (2) The maker is a limited dividend corporation which is not receiving payments from [HUD] under a rent supplement contract pursuant to Section 101 of the Hous-

ing and Urban Development Act of 1965, and the *prepayment occurs after the expiration of 20 years from the date of final endorsement.* . . ." (Emphasis added). See Addendum to Mortgage Note (of Gateway Investors), dated June 7, 1973. Thus, according to plaintiffs, the HUD Commitment constituted an offer to plaintiffs of a government-insured loan which, in accordance with regulations "now in effect," could be prepaid without HUD approval after a period of twenty years from the date of endorsement.

The plaintiffs cite additional language in the HUD Commitment to the effect that the government-insured loan was subject to "the terms and conditions set forth below." One of the terms and conditions was that HUD be furnished, prior to the initial insurance endorsement, with the mortgage and mortgage note evidencing the debt secured. In addition, the HUD Commitment required that "[a]ll certificates, documents and agreements called for by this commitment shall be on forms approved or prescribed by [HUD]." The mortgage notes furnished by the plaintiffs were on HUD-prescribed and -approved forms that contained language granting plaintiffs the option of prepaying after 20 years without HUD approval. Thus, the 20-year prepayment provision in the mortgage notes accorded with applicable federal regulations.

The plaintiffs argue that they each accepted HUD's offer, embodied in the Commitment for Insurance of Advances, by signing the Mortgagor's Certificate. In the Mortgagor's Certificate each plaintiff stated that "[t]he undersigned hereby agrees to accept a loan insured by [HUD] upon the terms set forth in your Commitment." An express term of the HUD Commitment, according to plaintiffs, was the right to prepay the loan after 20 years without HUD approval.

Plaintiffs assert that the Federal Circuit, in *Cienega Gardens*, though it did analyze the HUD Commitment in considering "whether the transaction framed by the commitment, the deed of trust note, the deed of trust, the loan agreement, and the regulatory agreement . . . . gave rise to privity of contract between HUD and the Owner(s)" with respect to prepayment rights, 194 F.3d at 1241, never addressed the question of whether privity was established by the HUD Commitment and the Mortgagor's Certificate. The Mortgagor's Certificate was not included in the list of documents the Federal Circuit cited as framing the transaction in *Cienega Gardens*. Nor was it mentioned, by the majority or the dissent, any where else in the opinion. Indeed, plaintiffs indicate that the Mortgagor's Certificate was not even part of the record on appeal. In the plaintiffs' view, the Mortgagor's Certificate conclusively demonstrates privity of contract because it is the document by which the plaintiffs directly accepted HUD's offer. Accordingly, plaintiffs assert that the Government should not be granted summary judgment on their contract formation claim.

Defendant counters that the Federal Circuit explicitly addressed one of the subject documents—the HUD Commitment—in *Cienega Gardens*, and the reasoning in that opinion makes clear the court's view that privity could not be established by that document and the Mortgagor's Certificate. The Federal Circuit stated that "[t]he only document that addressed prepayment was the deed of trust note with its attached Rider A," to which HUD was not a party, 194 F.3d at 1242. Neither the HUD Commitment nor the Mortgagor's Certificate, defendant maintains, contain any provision regarding prepayment. Furthermore, defendant argues that the HUD Commitment merely obligated HUD to provide its insurance endorsement, not a loan. The loans, with their prepayment provisions, were provided by the lenders in separate, free-standing mortgage notes. Reference to NHA regulations in the HUD Commitments cannot serve to make HUD a party to the mortgage notes. Moreover, even if the NHA regulations were incorporated into the HUD Commitments, defendant argues, the regulations were, by their very terms, subject to amendment, 24 C.F.R. § 236.249 (1973–75).

The court agrees with defendant that the HUD Commitment and the Mortgagor's Certificate cannot form the basis of contractual privity between HUD and the plaintiffs with regard to the prepayment rights in the mort-

gage notes. The Federal Circuit clearly stated that the HUD Commitment was one of the documents it considered in analyzing the contract documents in *Cienega Gardens* to determine which of them "gave rise to privity of contract between HUD and the Owner insofar as the right to prepay the mortgage loan was concerned." 194 F.3d at 1241. The only logical interpretation of the court's conclusion that "the question of whether privity of contract was satisfied turns, in the case of each Owner, on consideration of the deed of trust note and the regulatory agreement," *id.*, is that the Federal Circuit did not view the HUD Commitment as establishing such privity with respect to prepayment. Any doubt on this issue is dispelled in the court's final summation of its contract findings in *Cienega Gardens:* "Pursuant to each 'Commitment for Insurance of Advances,' HUD contracted to provide mortgage insurance, *but did not agree to any prepayment terms.*" *Id.* at 1246 (emphasis added).

It is true that the Federal Circuit did not address the Mortgagor's Certificate in its opinion. Considering the nature and substance of the HUD Commitment, however, it is clear that bringing the Mortgagor's Certificate into the analysis could no more establish prepayment privity between HUD and the plaintiffs than the HUD Commitment could standing alone. The HUD Commitment and the Mortgagor's Certificate established a contract of mortgage insurance between HUD and each of the plaintiffs. There is no language in either of those documents, however, that refers to prepayment rights in connection with the mortgage notes, which the Federal Circuit found to be separate contracts between the owners and lenders. General references in the HUD Commitment to the applicability of NHA regulations cannot serve to bootstrap prepayment provisions between the owners and lenders in their mortgage notes into the mortgage insurance contracts between HUD and the owners.

The court also agrees with defendant that the NHA regulations referenced in the HUD Commitments (which allowed prepayment of a HUD-insured loan after 20 years without HUD approval) were, as the Federal Circuit found in *Cienega Gardens*, "expressly subject to amendment." 194 F.3d at 1244. The pertinent regulatory language reads as follows:

> *"The regulations in this subpart may be amended by [HUD] at any time and from time to time, in whole or in part, but such amendments shall not adversely affect the interests of a mortgagee or lender under the contract of insurance on any mortgage or loan already insured and shall not adversely affect the interests of a mortgagee or lender on any mortgage or loan to be insured on which [HUD] has made a commitment to insure."*

24 C.F.R. § 236.249 (1973–75). (Emphasis added.) In other words, the "regulations now in effect" that were referenced in each of the HUD Commitments involved in this action contained a provision that expressly allowed them to be amended at any time. The only caveat governing regulatory amendments was that they not have adverse consequences for *mortgagees or lenders* under existing or pending mortgage insurance contracts. There was no similar caveat in the regulations to protect *mortgagors,* like the plaintiffs herein, from the adverse effects of regulatory amendments.

At oral argument plaintiffs cited a couple of recent court decisions in support of the proposition that when federal regulations "now in effect" are referenced or specifically incorporated in a contract, the version in effect on the date the contract was executed is controlling, not a later amended version. One case, *General Dynamics Corporation, et al. v. United States,* 47 Fed.Cl. 514 (2000), involved a government contract that incorporated a federal acquisition regulation prescribing how the contractor was to be paid. The pertinent contract language read as follows:

> "[T]he Government shall make payments to the Contractor when requested as work progresses .... in amounts determined to be allowable by the Contracting Officer in accordance with *subpart 31 .2 of the Federal Acquisition Regulation (FAR) in effect on the date of this contract* and the terms of this contract."

47 Fed.Cl. at 554 (emphasis added in the opinion.) The court found that the contract language in *General Dynamics* incorporated a version of the applicable FAR in effect at the time the contract was executed, there being no further language in the contract (or the regulation) indicating that later versions of the regulation were also contemplated. *Id.* In the case at bar, the HUD Commitments to the plaintiffs referenced federal regulations that were, unlike the FAR at issue in *General Dynamics,* "expressly subject to amendment." *Cienega Gardens, supra,* 194 F.3d at 1244. Because the federal regulations "now in effect" expressly provided that they could be amended at any time, later versions thereof were equally applicable and binding on the parties. Accordingly, the *General Dynamics* scenario is inapposite to the case at bar.

The other case cited by plaintiffs is *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000). In *Mobil* the Supreme Court noted that the lease contracts at issue there were "subject to then-existing regulations and to certain future regulations" issued under specific statutory provisions. See 530 U.S. at 616, 120 S.Ct. 2423. The Court concluded that the additional contract language incorporating "all other applicable .... regulations" extended only to "regulations already in existence at the time of the contracts." *Id. Mobil* is easily distinguishable from the case at bar, however, because the regulations at issue there, as in *General Dynamics,* evidently did not include a provision expressly stating that they were amendable "at any time" (*i.e.,* embracing future, amended versions thereof). Accordingly, *Mobil* is no more helpful to the plaintiffs than *General Dynamics.*[2]

In any event, the Federal Circuit's opinions are binding on this court. Therefore, the Federal Circuit's finding in *Cienega Gar-*

*dens* that the subject regulations are subject to amendment is controlling precedent in this action.

There are no genuine issues of material fact with regard to plaintiffs' breach of contract claims based on the HUD Commitment and the Mortgagor's Certificate. For the reasons discussed above, the allegation that these contracts included provisions granting the owners the unrestricted right to prepay their mortgage notes after 20 years fails as a matter of law. Accordingly, the Government is entitled to summary judgment on that issue.

2.

 Plaintiffs also allege that they are intended third party beneficiaries to contracts between HUD and the lenders that contain the 20-year prepayment term. This court and its predecessor, the Court of Claims, have held that the Tucker Act confers jurisdiction over breach of contract claims by third party beneficiaries of contracts to which the Government is a party. *Carlow v. United States,* 40 Fed.Cl. 773, 780 (1998); *Hebah v. United States,* 192 Ct.Cl. 785, 428 F.2d 1334, 1339 (1970). Third party beneficiary status exists if the contract reflects an express or implied intent to benefit the third party. *Carlow,* 40 Fed.Cl. at 781 (citing *Montana v. United States,* 124 F.3d 1269 (Fed.Cir.1997)". "The intended beneficiary need not be specifically or individually identified in the contract," the Federal Circuit indicated in *Montana,* "but must fall within a class clearly intended to be benefited thereby." 124 F.3d at 1273.

 In the case at bar, HUD entered into contracts with the lenders in which HUD agreed to insure mortgage notes containing the 20-year prepayment term. The prepayment term controlled the termination of the contracts of insurance, in plaintiffs' view,

---

**2.** The case at bar is more akin to the situation in *Guaranty Financial Services, Inc. v. Ryan,* 928 F.2d 994 (11th Cir.1991), a "Winstar"-related claim in which the Court of Appeals held that the plaintiff's contract with the Government expressly allowed the Government to change applicable regulations. Various articles in the parties' agreement defined contract terms in accordance with specific regulations "or any successor regu-

lation thereto." 928 F.2d at 999. One such article stated in unequivocal language that the parties "expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the [plaintiff's] obligation under this Agreement." *Id.* See also *United States v. Winstar,* 518 U.S. 839, 868–69, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

since HUD's insurance obligation terminated upon the note's prepayment in full. According to plaintiffs, therefore, the prepayment term was an integral part of HUD's mortgage insurance contracts with the lenders. Since the prepayment term conferred upon the project owners a unilateral right to prepay the mortgage notes after 20 years, plaintiffs argue that it operated primarily for the plaintiffs' benefit. Indeed, plaintiffs contend that it was a chief inducement in getting them to accept the HUD-insured loan and participate in the section 236 housing program. Accordingly, plaintiffs maintain that they were intended third party beneficiaries of the mortgage insurance contracts between HUD and the lenders, and that they are entitled to a trial on their claim for breach of the prepayment term by HUD.

Without conceding that the plaintiffs were intended third party beneficiaries of the mortgage insurance contracts between HUD and the lenders,[3] defendant contends that it makes no difference because those contracts did not contain the prepayment terms allegedly breached. The 20–year prepayment terms, as the Federal Circuit found in *Cienega Gardens*, were contained only in the mortgage notes—*i.e.*, in contracts between the lenders and the owners. See 194 F.3d at 1242. Though HUD endorsed the mortgage notes for insurance, that act did not make HUD a party to those contracts. See *id.*

(Nor did HUD's endorsement incorporate any terms of the mortgage notes into the mortgage insurance contracts.) Thus, the mortgage insurance contracts between HUD and the private lenders did not contain or incorporate any prepayment provisions. So even if plaintiffs were found to be third party beneficiaries of those contracts, they still could not establish privity of contract with the Government in respect to the 20–year prepayment provisions.[4]

The court agrees with defendant. The plaintiffs' third party beneficiary theory does not aid them in establishing a compensable breach of contract claim. As there are no genuine issues of material fact and no legal foundation for the third party beneficiary argument, the Government is entitled to summary judgment on that issue.

### 3.

Plaintiffs assert that the Government is judicially estopped from arguing that contractual privity is lacking between HUD and the plaintiffs because the Government took, and prevailed upon, the exact opposite position in *United States v. George A. David, et al.*, Civil Action No. 94–7191, 1995 WL 57502, 1995 U.S. Dist. LEXIS 1630 (E.D.Pa.1995) (denying defendants' motion for partial dismissal), 1998 WL 351693, 1998 U.S.Dist. LEXIS 9605 (E.D.Pa.1998) (denying plaintiff's motion for partial summary judgment,

---

**3.** Federal courts have repeatedly recognized that the National Housing Act was primarily intended to benefit persons who live in inadequate housing, not commercial developers. See *U.S. v. Harvey*, 68 F.Supp.2d 1010, 1016–17 (S.D.Ind. 1998); *United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1103 n. 3 (D.Del.1988); *United States v. Winthrop Towers*, 628 F.2d 1028, 1036 (7th Cir.1980); *Cedar–Riverside Associates, Inc. v. City of Minneapolis*, 606 F.2d 254, 258 (8th Cir. 1979); *M.B. Guran Co., Inc. v. City of Akron*, 546 F.2d 201, 204 (6th Cir.1976).

**4.** In a similar case before this court, *Lurline Gardens Limited Housing Partnership, et al. v. United States*, 37 Fed.Cl. 415 (1997), a third party beneficiary argument was also rejected. In *Lurline Gardens* the plaintiffs argued that the prepayment regulation, 24 C.F.R. § 236.30(a)(1)(i) (1971, 1973), was incorporated into the mortgage insurance contracts between HUD and the lenders, and that the owners were third party beneficiaries of those contracts. Without deciding the third party beneficiary

question, the court noted that the subject regulation was not incorporated into the insurance contracts so that privity of contract between the owners and HUD with respect to the 20–year prepayment provision was lacking in any event. See 37 Fed.Cl. at 420, n. 7.

Furthermore, the language of the regulation appears to refute the plaintiffs' assertion that they were intended third party beneficiaries of the 20–year prepayment provision, even if that provision had been incorporated into the insurance contracts between HUD and the lenders. As previously discussed, the regulation in force when plaintiffs entered into the section 236 program during the 1970s, which included the 20–year prepayment provision, expressly stated that it was subject to amendment by HUD at any time, so long as the amendment did not adversely affect the interests of *mortgagees or lenders* under existing or pending mortgage insurance contracts 24 C.F.R. § 236.249 (1973–75). The regulation made no similar mention of protecting the interests of *mortgagors or owners*.

granting defendants' motion for summary judgment in part and denying said motion in part), 1998 WL 709292, 1998 U.S. Dist. LEXIS 15917 (E.D.Pa.1998) (denying plaintiff's motion for reconsideration). *U.S. v. David* was a suit brought by the Government in federal district court against four low-income housing owners with HUD-insured mortgages, in which the Government asserted that the mortgage note, the mortgage and the regulatory agreement were all part of the same transaction and must be construed together. In its brief opposing the defendant owners' motion for summary judgment, the Government wrote that:

> "The mortgage instruments support the United States' construction of the language of the regulatory agreements. First, the regulatory agreement is expressly incorporated into the mortgage by reference. The rules of construction require the two documents be examined together to ascertain the parties' objective intent. . . . .
>
> The mortgagor signs a [regulatory] agreement which states that it is entered into "[i]n return for [HUD's] endorsement for mortgage insurance. . . . The regulatory agreement is the *quid pro quo* for HUD's endorsement of the [mortgage] note for insurance."

United States' Memorandum in Opposition to the Defendants' Motion for Summary Judgment, Feb. 25, 1997, at 13–15.

In *Greenbrier, et al. v. United States,* 193 F.3d 1348 (Fed.Cir.1999), *rehearing denied and suggestion for rehearing en banc declined* (1999), *aff'g* 40 Fed.Cl. 689 (1998), *cert. denied,* 530 U.S. 1274, 120 S.Ct. 2740, 147 L.Ed.2d 1005 (2000)—a case involving a "breach of contract claim . . . . identical to that asserted . . . . in *Cienega Gardens,*" 193 F.3d at 1351, and decided by the Federal Circuit in accordance with the *Cienega Gardens* precedent—Judge Rader, in a concurring opinion, observed that "[d]uring the present case, this court learned that the United States had argued before the United States District Court for the Eastern District of Pennsylvania that the regulatory agreements with the owners and the mortgage notes were a single transaction. . . . . In my judgment, this revelation undermines this court's reliance on *Cienega Gardens* . . . ." *Id.* at 1360. After quoting pertinent parts of the Government's brief urging that the mortgage instruments and regulatory agreements be "construed together . . . . to ascertain the parties' objective intent," Judge Rader concluded that the Government's "statements in *David* cast a very different light on the United States' arguments that HUD did not intend to be bound by the terms of the mortgage agreements." *Id.* at 1360–61.

■ The doctrine of judicial estoppel provides that "where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." *Data General Corp. v. Johnson,* 78 F.3d 1556, 1565 (Fed. Cir.1996); *San Carlos Irrigation and Drainage Dist. v. United States,* 111 F.3d 1557, 1568 (Fed.Cir.1997). The doctrine seeks to preserve the integrity of the judicial process by preventing litigants from playing "fast and loose with the courts." *U.S. Philips Corp. v. Sears Roebuck & Co.,* 55 F.3d 592, 596 (Fed.Cir.1995). "The decision whether to invoke judicial estoppel lies within the court's discretion." *Data General Corp.,* 78 F.3d at 1565. As the Supreme Court recently noted in *New Hampshire v. Maine,* 532 U.S. 742, 121 S.Ct. 1808, 1815, 149 L.Ed.2d 968 (May 29, 2001), "[c]ourts have observed that '[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle' (quoting *Allen v. Zurich Insurance Co.,* 667 F.2d 1162, 1166 (4th Cir. 1982))." Several factors are typically considered, the Supreme Court continued, including (1) whether a party's later position is "clearly inconsistent" with its earlier position, *id.* (quoting *United States v. Hook,* 195 F.3d 299, 306 (7th Cir.1999)), (2) whether a party's earlier position was accepted by the court, and (3) whether the parties, without judicial estoppel, would be unfairly advantaged or disadvantaged. "In enumerating these factors," the Supreme Court advised, "we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." 121 S.Ct. at 1815.

Plaintiffs contend that the Government's shifting legal stance on the issue of privity of contract is exactly what the doctrine of judicial estoppel is meant to preclude. When the Government, in *United States v. David*, needed to establish that the regulatory agreements *and* the mortgage instruments together established privity between HUD and the owner, it argued such and won. Later, in *Cienega Gardens, Greenbrier*, and the case at bar, the Government took the contrary stance that contract privity between HUD and the owners was established only by the regulatory agreements.

■ The plaintiffs' argument cannot prevail. Judge Lourie, who authored the Federal Circuit's opinion in *Greenbrier*, specifically addressed the issue of the Government's prior brief in *U.S. v. David*. "During oral argument," the Judge wrote, "the Owners referred to a recently-filed brief by the United States in an unrelated case .... [They] argue that in that brief, the government admits to being in privity of contract with the Owners with regard to the mortgage notes' prepayment terms. *We do not discern such an explicit admission in the brief. Moreover .... we are bound by the holding in Cienega Gardens.*" 193 F.3d at 1355, n. 12 (emphasis added). Thus, the argument the plaintiffs are advancing in the case at bar has already been rejected by the majority in *Greenbrier*. Nor did Judge Rader, after his discussion of *U.S. v. David*, dissent from the majority's opinion. Indeed, in the closing sentence of his concurring opinion he also bowed to precedent: "Because *Cienega Gardens* governs in later cases on the same issue," Judge Rader wrote, "I must concur in the judgment of this court unless revisited *en banc.*" 193 F.3d at 1361. (As noted above, no *en banc* rehearing was held.) Thus, the Federal Circuit, with full knowledge of the Government's stance in *United States v. David*, did not invoke judicial estoppel in *Greenbrier*.

This court agrees with the majority view in *Greenbrier* that the language of the Government's brief in *U.S. v. David* leaves room for doubt—*i.e.*, does not contain an explicit admission—that the Government acknowledged being in privity of contract with the owners in regard to the prepayment terms of the mortgage notes. So the Government's position in the instant litigation cannot be said to be "clearly inconsistent" with its position in *U.S. v. David*. See *New Hampshire v. Maine, supra*, 121 S.Ct. at 1815.[5] *U.S. v. David*, moreover, involved an entirely different legal dispute. It was not a money claim against the United States, like *Greenbrier*, but rather an action filed by the United States against the owners of four HUD-financed and -insured housing projects who had allegedly misused some funds generated by the properties. The case did not address the specific issue of contract privity with respect to mortgage note prepayment terms.[6] In any event, the Federal Circuit's rulings in *Cienega Gardens* and *Greenbrier* are control-

**5.** In determining whether to apply judicial estoppel against the Government, the Supreme Court also pointed out that "broad interests of public policy may make it important to allow a change of positions that might seem inappropriate as a matter of merely private interests." *New Hampshire v. Maine*, 121 S.Ct. at 1817 (quoting 18 Wright, Miller & Cooper, § 4477 at 784). "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant." *Id.* (quoting *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)).

**6.** The district court in *U.S. v. David* appears to have regarded the documents linking the lender, the owners, and HUD as a single contract, as indicated by the following excerpt from its 1998 ruling on the cross motions for summary judgment: "the mortgage and the note, which together with the Regulatory Agreement comprise the entire contract between the parties and York [the lender]." 1998 WL 351693 at *4, 1998 U.S. Dist. LEXIS 9605 at 12. The issue of contract formation and privity was not central to that case, however, much less any mortgage note prepayment terms. District court rulings are not binding on the Court of Federal Claims, and their persuasive value is diminished if they do not directly and comprehensively address the issue that must be decided by this court. The district court's brief reference to the contract relationship in *U.S. v. David*, a subject not further discussed elsewhere in the court's three rulings from 1995 to 1998, is too off-handed and peripheral to the decision in that case to be of great persuasive value in the instant litigation.

ling in the case at bar, not the Government's legal memorandum in earlier, unrelated district court litigation. The Federal Circuit did not see fit to invoke the doctrine of judicial estoppel against the Government in *Greenbrier*, and this court will not do so here.

There are no genuine issues of material fact with respect to the judicial estoppel argument. For the reasons discussed above, the argument fails as a matter of law. Accordingly, the Government is entitled to summary judgment on the third and last of plaintiffs' breach of contract theories.[7]

## II. *Taking Claims*

■ The Tucker Act grants this court jurisdiction of "any claim against the United States founded .... upon the Constitution," 28 U.S.C. § 1491(a). To be actionable in this court a constitutional claim (not involving an illegal exaction) must be based on a provision that mandates the payment of money. *Eastport Steamship Corporation v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1007 (1967). The plaintiffs' taking claims are based on such a provision—the Fifth Amendment to the Constitution ("nor shall private property be taken for public use without just compensation"). The plaintiffs allege two grounds for the taking of their rental housing projects—by regulation and by physical occupation.

### 1.

■ With respect to the regulatory taking claim, the Supreme Court long ago held that "[w]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The Supreme Court has not provided any "set formula to determine where regulation ends and taking begins," but instead has provided a framework for fact-intensive, case-by-case inquiries that consider the economic impact of the regulation on the claimant, the extent of the regulation's interference with the owner's reasonable investment-backed expectations, and the character of the governmental action (*i.e.,* the extent to which the regulation promotes a broad public purpose). *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The starting point for any analysis of a regulatory taking claim is to determine the property interest at issue.

■ In the case at bar, the plaintiffs contend that they had state law property interests in their housing projects—entitling them to the economically productive use and enjoyment of the properties, exclusive possession, and the rights to transfer, devise, and dispose of the property—that were subject to a regulatory taking by the United States as a result of LIHPRHA. Had that legislation not been enacted in 1990, plaintiffs indicate they would have prepaid their HUD-insured mortgages after 20 years, freed themselves from the section 236 program, and been able to exercise all of the real property rights inherent in their housing units. That was their intention when they entered the section 236 program during the 1970s, plaintiffs assert. But LIHPRHA intervened, preventing the owners from prepaying their mortgages after 20 years and, in the words of the plaintiffs, effectively imprisoning their properties in the section 236 program. HUD continued to restrict the owners' rights of possession and disposition, and denied them the right to charge market rates for their housing. LIHPRHA destroyed the owners' state law property

---

7. Another case worth noting is *City Line Joint Venture v. United States*, 48 Fed.Cl. 837 (2001), which involved a below market rate mortgage loan insured by HUD under the NHA's section 221 program. HUD became the holder of the mortgage after City Line's default, thereby creating a contractual relationship between HUD and plaintiff. The mortgage contained a 20-year prepayment provision and plaintiff filed a notice of intent to prepay in December 1990. LIHPRHA had just been enacted, however, and the application was not approved by HUD. So plaintiff's property remained in the section 221 program until after the HOPE Act was enacted in 1996, which lifted prepayment restrictions and allowed plaintiff, finally, to prepay the mortgage in 1997. Plaintiff filed a breach of contract action in this court which was rejected on the grounds that LIHPRHA was a "public and general act," rather than an act intended to relieve the Government of its contractual obligations, and thus gave rise to a valid defense of impossibility by the Government.

rights, plaintiffs argue, effecting a regulatory taking of the subject properties on the 20–year anniversaries of HUD's mortgage insurance.[8]

The fundamental flaw in the plaintiffs' argument, as defendant points out, is the premise that the owners were entitled to unfettered control of their housing projects after the 20–year anniversary dates of their mortgage note endorsements by HUD. The plaintiffs voluntarily entered into the NHA's section 236 program during the 1970s. They executed regulatory agreements with HUD under which, in consideration of HUD's insurance of the mortgage notes from private lenders, the plaintiffs accepted affordability restrictions on their properties (thereby giving up various property rights such as exclusive possession, setting rental rates, and unqualified freedom to sell or otherwise transfer the subject properties) for "as long as the contract of mortgage insurance between HUD and the lender remained in effect, or during any time HUD held or was obligated to insure a mortgage on the project." The plaintiffs' mortgage notes all had payment terms of 40 years. Though the mortgage notes provided that the owners could prepay after 20 years without HUD approval, the notes were private contracts between the owners and the lenders to which the Government (HUD) was not a party. See *Cienega Gardens,* 194 F.3d at 1242 (Fed.Cir.1998). Thus, the prepayment provisions merely established that the lenders could not block the owners from prepaying their notes. They did not bind HUD to go along with the owners' wishes.

As previously discussed, federal regulations in effect during the 1970s· did allow owners in the NHA's section 236 program to prepay their mortgage notes after 20 years without HUD approval. The prepayment terms in the mortgage notes tracked these regulations. However, as the Federal Circuit found in *Cienega Gardens,* 194 F.3d at 1244, the regulations [24 C.F.R. § 236.249]

expressly stated that they were subject to amendment by HUD "at any time." Thus, when Chancellor Manor, Oak Grove Towers, and Gateway Investors entered into the section 236 program they knew, or should have known, that the regulations governing the prepayment of their mortgage notes could be changed in a manner that might restrict the owners' option to prepay after 20 years. The consequence of not being able to prepay after 20 years was obvious. The section 236 affordability restrictions could continue on each of the properties, under the terms of the regulatory agreements between the owners and HUD, for the full 40–year terms of the mortgage notes. That meant that the plaintiffs knew, or should have known, that they could not count on full restoration of their rights to exclusive possession, to charge market rates, and to freely dispose of their housing projects—rights which they conveyed to HUD for valuable consideration in their regulatory agreements in the 1970s—until the time frame of 2013 to 2015. In other words, the plaintiffs' expectations (or hopes) of converting their projects to conventional, market-rate rental properties after 20 years did not inhere in their ownership of the properties. When LIHPRHA was enacted, therefore, the plaintiffs did not even hold the state law property rights they are claiming, and the prepayment prohibition could hardly effect a taking of property rights which the plaintiffs did not possess. As the Federal Circuit recently confirmed, it is a "bedrock requirement that the existence of a valid property interest is necessary in all takings claims." *Wyatt, et al. v. United States,* 271 F.3d 1090, 1097 (Fed.Cir.2001).

■ The plaintiffs also assert that they have suffered the regulatory taking of contract rights to prepay their mortgages after 20 years. As previously discussed, the only contracts addressing the right of prepayment were the mortgage notes between the owners and the lenders. The United States was not a party to those contracts. The plaintiffs in

---

8. In *Greenbrier* and *Cienega Gardens, supra,* this court and the Federal Circuit dealt with the issue of whether the plaintiffs' regulatory taking claims were ripe. In the case at bar the Government did not raise the issue of ripeness in its motion for summary judgment. At oral argument counsel for defendant stated that "we assume for purposes of this motion that the claims are ripe," but he indicated that ripeness would be contested at trial if the summary judgment motion were denied.

this action were venturers in a highly regulated field of government mortgage insurance for low-income housing. Their mortgage contracts with the lenders were subject to federal law and regulations governing this field. Accordingly, the prepayment terms in the mortgage notes were subordinate to and limited by the regulations which expressly reserved to HUD the authority to change the rules on prepayment. As the Supreme Court stated in *Connolly v. Pension Benefit Guaranty Corporation,* 475 U.S. 211, 223–24, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986):

> "Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them. (Citation omitted.) If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions."

Thus, federal law and regulations with respect to the prepayment of HUD-insured mortgage loans under the section 236 program trumped any contrary provisions in the owners' mortgage contracts with the lenders. It follows that the 20–year prepayment provisions in the mortgage notes were not vested contract rights that the owners could assert against either the lenders or HUD in the event that the Government acted, by statute or regulation, to change the prepayment rules. Accordingly, the Government's enactment of LIHPRHA, which prevented the owners from prepaying their notes immediately after the 20–year anniversaries of HUD's insurance endorsement in 1993, 1994, and 1995, respectively, did not effect a taking of any contract rights held by the plaintiffs.

The 20–year anniversaries for *Oak Grove Towers* and *Gateway Investors* came in January 1994 and June 1995, respectively. LIHPRHA's prepayment restrictions were in effect at those times. So the owners' regulatory agreements with HUD remained in effect and their rights in the subject property-

ties, vis-a-vis HUD, remained the same as they had been during the preceding 20 years. The enactment of the HOPE Act in March 1996, however, rescinded the prepayment restrictions. That allowed Oak Grove Towers and Gateway Investors to prepay their mortgage notes and begin charging market rates in October 1997. This was far in advance of when the 40–year notes would have been paid off at full term—in 2014 and 2015, respectively—before which time, absent the HOPE Act, the plaintiffs would have had no legal right to terminate their regulatory agreements with HUD, leave the section 236 program, and convert their housing projects to market rate rental properties. Thus, no property or contract rights were taken from Oak Grove Towers and Gateway Investors during LIHPRHA's relatively brief freeze of their mortgage note prepayment options.

As for *Chancellor Manor,* the 20–year anniversary of its HUD insurance endorsement arrived a little earlier—in August 1993. Like its co-plaintiffs, Chancellor Manor applied for incentives to continue in the section 236 program. Unlike its co-plaintiffs, however, whose applications were still pending at the time the HOPE Act was enacted, Chancellor Manor's application was approved by HUD and a new Use Agreement and Amended Regulatory Agreement executed in February 1995, a year prior to the HOPE Act. The new agreement(s) obligate Chancellor Manor, as Mr. Bernardi acknowledged in his affidavit (no. 1), *supra,* to remain in the NHA's section 236 program for at least another 50 years, until 2045. As of February 1995, therefore, Chancellor Manor could no longer seek to prepay its loan under LIHPRHA, and it is precluded by its new agreements with HUD from exercising any prepayment option under the HOPE Act of March 1996.

At oral argument both plaintiffs' and defendant's counsel indicated that Chancellor Manor could have declined all three options under LIHPRHA—*i.e.,* to (1) sell the project to a non-profit organization, (2) accept additional incentives to stay in the section 236 program, or (3) apply for permission to prepay the mortgage—and simply continued to pay off its 40–year mortgage note as sched-

uled. This would have ended Chancellor Manor's participation in the section 236 program, and freed it of the program's restrictions, when the note was paid off in 2013. Instead, Chancellor Manor chose to sign a new agreement with HUD accepting additional financial incentives in exchange for keeping its project in the section 236 program until at least 2045. Chancellor Manor bemoans its current situation, but the record does not corroborate its contention that it had no choice in the matter. Chancellor Manor made a business decision in the 1993–95 time frame, no doubt after weighing what it perceived to be the relative advantages of taking LIHPRHA incentives with a longer commitment to the section 236 program versus rejecting LIHPRHA incentives and maintaining its pre-existing, shorter commitment to the section 236 program, or selling its housing project to a non-profit entity. Chancellor Manor must now live with the consequences of that business decision.

That Chancellor Manor would have made another choice if the HOPE Act had passed earlier is of no legal consequence. The HOPE Act's repeal of prepayment restrictions was essentially a windfall to owners like Oak Grove Towers and Gateway Investors, who had not yet made binding choices under LIHPRHA to sell their projects or stay in the section 236 program with additional incentives. They, like Chancellor Manor, had no vested rights (under their regulatory agreements with HUD or their mortgage notes with the lenders) to prepay their loans, and therefore no legal right to escape section 236 restrictions before their mortgage terms expired. Accordingly, no property or contract rights were taken from Chancellor Manor by virtue of LIHPRHA's enactment and Chancellor Manor's decision to accept additional financial incentives from HUD under that law in exchange for extending its participation in the section 236 program,

rather than continuing to pay off its 40–year mortgage note without LIHPRHA incentives and thereby terminate its section 236 restrictions earlier.

There are no genuine issues of material fact with respect to the plaintiffs' regulatory taking claims. For the reasons discussed above, these claims fail as a matter of law. Accordingly, the Government is entitled to summary judgment on the claims.[9]

2.

 The plaintiffs claim, alternatively, that their housing projects have been subject to takings by physical occupation when the Government failed to vacate the respective properties after 20 years. It is established case law that when private property is invaded and occupied by the government, or by a third party acting with government authorization, a physical taking has occurred requiring "just compensation" under the Fifth Amendment. As stated by the Supreme Court. "We have long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause..... [W]hen the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Moreover, a permanent physical occupation is a taking "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 419–20, 102 S.Ct. 3164. Temporary physical takings are likewise compensable under the Fifth Amendment. As the Supreme Court stated in *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 319, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), "[t]emporary takings are not different in kind from permanent takings, for which

---

9. Since the court has ruled that none of the plaintiffs held any property or contract rights that could have been taken under LIHPRHA, there is no occasion to discuss the three-prong test for regulatory takings set forth in *Penn Central, supra.* The Penn Central analysis presupposes that the plaintiff(s) held some property interest that was at least affected by a federal statute or regulation. In the case at bar, LIH-

PRHA had no effect on the plaintiffs' rights in the subject properties. The plaintiffs' regulatory agreements with HUD from the 1970s continued to govern the legal status of their properties after the 20–year anniversaries of HUD's insurance endorsement and, had the plaintiffs so chosen, could have continued to do so for the full 40–year terms of their mortgage notes.

the Constitution clearly requires compensation."

 The Federal Circuit recently rejected a physical (or *per se*) taking claim identical to that asserted in this action. See *Cienega Gardens, et al. v. United States,* 265 F.3d 1237 (Fed.Cir.2001) (*"Cienega II"*). In *Cienega II* the housing owners asserted that their properties had suffered a *per se* taking because the prepayment restrictions of ELIPHA and LIHPRHA "forced the Owners to use their properties to house government-approved, low-income tenants and prohibited the Owners from converting their properties to other uses." *Id.* at 1248. The Federal Circuit stated that "[w]e disagree [with the housing owners' contention] that ELIPHA and LIHPRHA give rise to a physical occupation of the Owners' property as required to show a *per se* taking. We agree with the trial court's ruling that 'the effect of the prepayment restrictions ... is merely to enhance an existing tenant's possessory interest,' and that they do not authorize a 'permanent physical occupation' of the Owners' property. *Cienega Gardens [v. United States]*, 33 Fed.Cl. at 217 [1995]." *Id.* The Federal Circuit ruling in *"Cienega II"* is binding on this court. Nor would the result be any different, as the Supreme Court made clear in *First English Evangelical Lutheran Church, supra,* if the claim were for a temporary taking.

There are no genuine issues of material fact with respect to the plaintiffs' physical taking claims. For the reasons discussed above, these claims fail as a matter of law. Accordingly, defendant is entitled to summary judgment on the claims.

### *CONCLUSION*

For all the reasons discussed hereinbefore, there is no merit to plaintiffs' claims that the Government had a contractual obligation to permit unrestricted prepayment of their HUD-insured mortgage notes after 20 years which was anticipatorily breached by the enactment of the LIHPRHA legislation in 1990, or that said legislation resulted in a taking of plaintiffs' rental housing properties without just compensation.

Defendant's motion for summary judgment is GRANTED. The clerk is ordered to enter judgment DISMISSING the complaint. No costs.